JUSTICE TRAPP
 

 delivered the opinion of the court:
 

 Defendants John Mock and Doris Blomquist bring separate appeals to this court from a judgment of the circuit court of Coles County entered on a jury verdict finding the last will and testament of Madge Willis invalid. On this court’s motion, the cases have been consolidated for disposition. Issues raised in both appeals include whether the trial court erred in excluding evidence under the Dead Man’s Act (Ill. Rev. Stat. 1981, ch. 110, par. 8 — 201), whether a gerontologist may rely on nursing home records in forming an opinion on mental competency, and whether the trial court erred in refusing to admit certain exhibits. In cause No. 483-0089, defendant Blomquist has made additional arguments including whether the trial court erred in overruling motions for a directed verdict and a new trial, and for post-trial discovery. We affirm.
 

 Madge Willis died on January 16, 1980, at the age of 85 in the Cumberland Nursing Center near Toledo, Illinois. In February of 1980, decedent’s alleged last will and testament was duly admitted to probate in the circuit court of Cumberland County and letters testamentary were issued to her executor, defendant, John Mock. The alleged last will and testament of decedent was executed on December 21, 1979, and purported to divide decedent’s estate among 20 churches and community organizations and 37 individuals, some of whom were or had been employees of the nursing center where Mrs. Willis had spent the latter part of her life. Under the will defendant Mock received 30 shares of stock of the First National Bank of Toledo ($3,000) and defendant Blomquist received testatrix’s home and its contents. The total value of the estate for tax purposes was $362,255.51.
 

 On July 24, 1980, plaintiffs Aleen Manning and Harry Gipson, heirs of the testatrix, filed a two-count complaint in the circuit court of Cumberland County against 77 defendants, heirs of the testatrix and legatees under the last will and testament. Count I alleged a lack of testamentary capacity and count II charged that defendant John Mock, in abuse of an alleged fiduciary relationship, procured the execution of the will to secure for himself and others associated with him a substantial benefit. Plaintiffs later amended their complaint to add a final count (count III) which alleged that decedent did not sign the will which had been admitted to probate. Defendants Mock and Bloomquist answered plaintiffs’ complaint and denied the material allegations therein.
 

 The evidence shows that testatrix and her late husband, Ben Willis, made their home in Toledo, Illinois, for most of their lives. Her late husband had been president of the First National Bank of Toledo, and decedent had been on the board of directors of the bank until her death. Testatrix was predeceased by her husband and had no children. In 1971, testatrix broke her hip and went to the nursing home where she remained until her death in 1980. While in the nursing home, testatrix managed her personal business affairs until 1979 when two powers of attorney were executed. The first authorized her sister-in-law, Betty Kelly, to manage her business affairs, and the second authorized defendant Mock. The second power of attorney was executed following Betty Kelly’s death in October of 1979. At testatrix’s death, she owned the largest minority block of stock of the bank, approximately 11% of all outstanding shares.
 

 At trial, the parties introduced considerable evidence concerning the physical and mental health of testatrix while she was at the nursing home. Three of the plaintiffs’ witnesses were nursing home employees who cared for testatrix during the last months of her life. One such employe, Janet Reisner, stated that during the last few months of testatrix’s life she gradually went downhill, spoke less, seemed disoriented, and did not recognize her. Reisner stated that testatrix could not feed, dress, bathe, or get out of bed herself, and she never saw testatrix play games, read, or write. Reisner testified that testatrix gradually spoke less and less. During the 1979 Christmas season, Reisner showed testatrix a Christmas card, but testatrix thought it was an Easter card. Reisner opined that Madge Willis was not capable of compiling a list of people or organizations, was not of sound mind, did not know who her relatives were, and did not know the nature and extent of her property. Reisner acknowledged on cross-examination that she was not listed as a beneficiary and admitted making a note on Willis’ nursing home records on December 12, 1979, that testatrix was “usually alert, communicates well, very slow at times.”
 

 Bernice Sharp, another employee of the nursing home, testified along the lines of Reisner that Madge Willis was unable to care for herself, spoke seldom, and did not read or watch television. Sharp took a leave of absence on November 1, 1979, but opined that as of then Willis was not of sound mind and memory, was incapable of knowing her relatives, and was unaware of the nature and extent of her property. Another employee, Ina Green, was called for both the plaintiffs and the defendants. Green acknowledged that she was a beneficiary under the will and was present when it was executed on December 21. She agreed that testatrix was physically unable to sign her name and that she did help testatrix sign her last name to the instrument. Green stated that testatrix “just seemed to be unable to finish,” and “I put my hand over her hand and steadied it, and guided, I guess you would say.” Green acknowledged that testatrix did not ask for her assistance but stated that she did not take the pen in her hand.
 

 Glen Neal, the attorney who drafted the 1979 will, testified that he knew testatrix all his life and drafted the will from a set of instructions furnished by defendant Mock. Neal stated that he never talked to testatrix about the will.
 

 Plaintiffs’ medical expert was Dr. Richard Hamm, a gerontologist at the University of South Florida. Dr. Hamm testified that he reviewed the nursing home records of Cumberland Nursing Center and records from the Sarah Bush Lincoln Health Center, where testatrix was hospitalized, and stated that such records were of a type ordinarily used and relied upon by members of his profession. In response to a lengthy hypothetical by plaintiffs, Hamm responded that testatrix was not of sufficient judgment to sign the 1979 will, was a very dependent old lady, was absolutely reliant upon other people for all of her needs and was uncommunicative and incapable of explaining or understanding her basic needs.
 

 In contrast to the testimony of plaintiffs’ witnesses, defendants presented the testimony of numerous witnesses who opined that testatrix had the capacity to know her property and relatives and was of sound mind.
 

 Pearl Connell, age 79, testified that she had known testatrix for 45 to 50 years and had visited her three to five times in 1979, including one visit shortly before Christmas. Connell stated that during her visit she asked testatrix if she knew who she (Connell) was and that testatrix replied that she did. On cross-examination, Connell admitted that she asked Madge Willis if she knew who she was because Connell did not know for sure.
 

 Norma Bartelsmeyer, Lois Lashmet, and Thursa Lyons testified that they had known the testatrix for over 40 years and visited her in the nursing home in October of 1979. Based upon the October visit, Bartelsmeyer was of the opinion that testatrix was of sound mind and memory, knew her relatives and the nature and extent of her property. Lashmet stated that testatrix was active in the “science club” (beneficiary under the 1979 will), the Toledo American Legion (beneficiary), and the Kiwanis Club (beneficiary). She visited testatrix on October 18 and stated that testatrix was alert and her responses appropriate. Lashmet stated that while her husband was hospitalized in Florida in January of 1979, he received a get well card from Madge Willis. (The card was offered for admission by defendant Mock, but on motion of plaintiffs, the card was excluded for an improper foundation.) Lyons visited testatrix at the nursing home on October 18, 1979, along with Pearl Connell and Lashmet. She could not recall what was discussed or how long she was there, but opined that on that date testatrix was definitely of sound mind and memory, had the capacity to know her relatives, and the nature and extent of her property.
 

 Mary Hunt, Una Janes, and Mary Kirkham testified that they were witnesses to the will’s execution. They were in the nursing home beauty shop on December 21 and were asked by defendant Mock to witness the will. Hunt testified that when she entered the testatrix’s room defendant Mock had the will in his hand and said, “[T]his is a will. Madge has read it — it has been read to her — she knows what’s in it.” She stated that testatrix “signed her first name and then she was so shakey, her hand was, that Mrs. Green steadied her hand so that she could sign her last name.” The testimony of Hunt was corroborated by Janes and Kirkham.
 

 Dr. Leland McNeil, testatrix’s physician, stated that testatrix was sent to the nursing home in 1971 after she fractured her hip and in 1978 she had a stroke and was admitted to Sarah Bush hospital. McNeil testified that Madge Willis gradually recovered but did have speech difficulties. He stated that testatrix was somewhat obstinate and talked to people she wanted to, but often did not talk to a person if she did not like that particular person. From mid-1978 until testatrix’s death, McNeil saw her every three months. Based upon his personal knowledge of her and the medical records kept by the nursing home, he was of the opinion that she was of sound mind and memory, knew the nature and extent of her property and knew her relatives. On cross-examination, McNeil acknowledged that testatrix needed assistance in feeding, was incontinent, and had arteriosclerosis. McNeal also acknowledged that nursing home records contained entries of October 31 that testatrix was “confused and disoriented,” of October 23 “still very confused and disoriented,” and on November 28 “is depressed, withdrawn, confused and disoriented.” On redirect, he stated that he also relied upon nursing home records which showed that on September 22 “patient shows more awareness to surroundings,” and on December 24 “Madge is alert.”
 

 Defendant Mock testified that he was a lifelong resident of Toledo and had been sheriff and county treasurer of Cumberland County. Presently, Mock is the president of the First National Bank of Toledo. Over objection, Mock testified that he first saw the testatrix’s will on December 18, in attorney Glen Neal’s office. When asked if he participated in the preparation of the will, plaintiffs objected on the basis of the Dead Man’s Act. (Ill. Rev. Stat. 1981, ch. 110, par. 8 — 201.) The court sustained the objection, and an offer of proof was made. The substance of the offered testimony was that Mock and testatrix had several discussions concerning whom she wanted to leave her property to. According to Mock, he visited the testatrix in late November and she requested him to draft a will. Acting on this instruction, Mock went to attorney Neal’s office who told him what information was needed to draft a will. Mock returned to testatrix’s nursing home around December 10 or 12, discussed the disposition of her estate, and conveyed this information to Neal, who then prepared a rough draft. Mock stated that he took the rough draft back to testatrix, further discussions were had, and final changes were made and given to Neal. Neal then prepared a final copy which he gave to Mock, Mock returned to the nursing home, discussed the terms further with testatrix, and the will was then executed. The trial court sustained plaintiffs’ objection, but did permit Mock to testify to the events surrounding the execution of the will from the time the witnesses were assembled in testatrix’s room. Mock’s testimony concerning the execution of the will was similar to that of Hunt, Kirkham, and Janes. On objection of plaintiff, Mock was also not allowed to give an opinion on the testatrix’s mental capacity.
 

 Closing arguments were made, and the jury was instructed on three distinct theories to find the will invalid: (1) lack of testamentary capacity, (2) undue influence, or (3) improper execution. A general verdict was returned for plaintiffs finding the alleged will to be invalid and the trial court entered judgment upon the jury’s verdict.
 

 At trial, the plaintiffs called Ina Green and attorney Glen Neal to testify concerning the preparation and execution of the will. Green stated that she witnessed the execution of the will and “steadied and guided” decedent’s hand in writing her signature. Attorney Neal testified that he drafted the will from a set of instructions delivered by defendant Mock which Neal assumed was in Mock’s handwriting. He testified that he never talked to the decedent but did deliver testatrix’s will to defendant Mock. After delivery of the will to Mock, Neal never saw it again until Mock brought it to him to be admitted to probate.
 

 It is the defendants’ contention that the introduction of this testimony by the plaintiffs “opened the door” under the Dead Man’s Act to allow Mock to testify fully in reference to his total participation in the will’s preparation and execution. Defendants argue that the conversations with the decedent and Mock commencing in late November or early December and culminating in the execution of the will on December 21 were an integral part of the event testified to by Ina Green on behalf of the plaintiffs and should have been admissible under section 8 — 201(a) of the Dead Man’s Act (Ill. Rev. Stat. 1981, ch. 110, par. 8 — 201(a)).
 

 Section 8 — 201 of the Code of Civil Procedure provides in part:
 

 “In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, except in the following instances:” (Ill. Rev. Stat. 1981, ch. 110, par. 8 — 201.)
 

 Exception (a) to this general rule provides:
 

 “(a) If any person testifies on behalf of the representative to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event.” Ill. Rev. Stat. 1981, ch. 110, par. 8 — 201(a).
 

 The parties, as well as this court, have been unable to find any decisions interpreting the word “event” as used in the current statute. Although the parties have referred us to similar circumstances in Perkins v. Brown (1948), 400 Ill. 490, 81 N.E.2d 207, and Garrus v. Davis (1908), 234 Ill. 326, 84 N.E. 924, we deem these decisions inapposite since they were concerned with the proper interpretation of section 3 of the prior Dead Man’s Act, whose language is materially different than presently provided. Defendants suggest that the word “event” appearing in the present statute (Ill. Rev. Stat. 1981, ch. 110, par. 8 — 201(a)) should be deemed equivalent in scope to the word “transaction” as used in the former provision. (See Ill. Rev. Stat. 1971, ch. 51, par. 2.) We find no historical or statutory association between these words by reason of the plain language of the respective sections. The word “transaction” found in the prior statute is explicitly limited to a conversation or a transaction between an agent of the deceased person, an opposing party, or an interested person. The respective statutory provisions patently refer to distinctly different testimonial relationships. Plaintiffs do not dispute that they opened the door with testimony concerning the “event” but construe the word “event” as used in the Dead Man’s Act to have a logical limitation as to time and place. The trial court construed subparagraph (a) of section 8 — 201 of the Dead Man’s Act to mean that “event” was only the act of the execution of the will which the witness Green had testified to and not the total event of all actions leading up to the will’s preparation.
 

 The purpose of all statutory construction is to give effect to the legislature’s intent by examining the language employed in the statute, giving it its plain and ordinary meaning, and also by looking to the necessity for the law, the evil sought to be remedied, and the object sought to be attained. (In re Roberts Park Fire Protection District (1975), 61 Ill. 2d 429, 337 N.E.2d 8.) The word “event” as ordinarily used and understood refers to a “happening or occurrence” (Webster’s New World Dictionary 485 (second college ed. 1976).) It is undisputed that plaintiffs introduced no evidence concerning Mock’s meetings with testatrix wherein they purportedly discussed the execution of the will. The only testimony relied upon by defendants to open the door is that of Green and Neal, neither of whom discussed decedent’s alleged meetings with Mock. The only happening or occurrence testified to which occurred in the presence of the decedent was the actual execution of the will which was described by the witness Green. Clearly the word “event,” when given its plain and ordinary meaning, is not as encompassing as defendants would have us read it.
 

 Defendants also charge that the trial court improperly excluded statements of Mock concerning heirship. In the offer of proof, Mock stated that while he was discussing the preparation of the will with testatrix the following statement was made:
 

 “I named other people -1 named Mrs. Manning, she said, ‘Yes, Mrs. Manning is a cousin, the only relative I have.’ Then I said, ‘Well, you have another cousin.’ She said, ‘No, I do not.’ I said, ‘Yes, Harry Gipson, I understand, is a cousin.’ She said, ‘Harry Gipson is dead.’ I said, ‘No, Harry Gipson lives in Tuscola; I know Harry Gipson, and I understand he’s a cousin.’ She said, ‘He’s not a cousin of mine.’ So I said, ‘Well, let me put his name down, and you think on it.’ ”
 

 Defendants claim that these statements were admissible as testimony concerning heirship, an exception to the Dead Man’s Act. Subsection (d) of section 8 — 201 of Dead Man’s Act provides that “[n]o person shall be barred from testifying as to any fact relating to the heirship of a decedent.” Ill. Rev. Stat. 1981, ch. 110, par. 8 — 201(d).
 

 The simple answer to defendants’ contention is that heirship was not at issue at the trial. Before the will contest was tried, defendant Mock signed an affidavit admitting that Harry Gipson and Aleen Manning were cousins and an order of heirship was entered in the probate court so finding both the affidavit and the order finding heir-ship were admitted into evidence in the will contest case. The statements concerning the heirship of testatrix were irrelevant since there was no issue of heirship at trial.
 

 Defendants contend that Mock’s offered testimony on a number of matters concerned events out of the decedent’s presence and should not have been excluded under the Dead Man’s Act. These matters were: (1) the request by defendant to attorney Neal that he prepare the will for decedent; (2) the request of attorney Neal to defendant that defendant obtain information from the decedent from which to prepare the will; (3) the delivery of the information gathered by defendant to attorney Neal; and (4) the preparation of the preliminary and final draft of the will by attorney Neal. The present Dead Man’s Act, unlike the statute prior to 1973, imposes no rule of general incompetency on adverse parties or interested persons to testify against a decedent’s estate. The present act only bars such persons and parties from testifying concerning conversations with the decedent and events occurring in the decedent’s presence. Ill. Rev. Stat. 1981, ch. 110, par. 8 — 201; In re Estate of Netherton (1978), 62 Ill. App. 3d 55, 378 N.E.2d 800.
 

 The offer of proof indicates that all of these events which allegedly occurred out of the decedent’s presence were events growing out of a conversation with the decedent. Mock attempted to explain in the offer of proof that decedent had told him to have Neal draft the will and the statements made to Neal concerned Mock’s conversation with decedent. The purpose in bringing these events before the jury was to demonstrate that specific conversations were had with decedent to coordinate the drafting of the will by Neal. Such matters were plainly prohibited by the Dead Man’s Act and were properly excluded.
 

 Defendants’ last issue pertaining to the Dead Man’s Act challenges the trial court’s ruling that prohibited an opinion by Mock on testatrix’s mental competence. The supreme court has made it plain that a lay witness should not give an opinion on the issue of testamentary capacity unless a foundation of facts and circumstances is established for the opinion. “A person who is not an expert may give his opinion concerning the mental capacity of a testator if it appears that the witness has an acquaintance with the person whose competency is in question, and relates facts and circumstances which afforded reasonable ground for determining the soundness or unsoundness of mind of such person.” (Quellmalz v. First National Bank (1959), 16 Ill. 2d 546, 552, 158 N.E.2d 591, 594.) Since the foundation for Mock’s opinion is necessarily conversations with decedent and events occurring in her presence, no foundation could be established to introduce an opinion, and lacking such, the opinion would be inadmissible. The trial court correctly excluded Mock’s opinion of testatrix’s mental capacity under the Dead Man’s Act.
 

 Defendants next allege that the trial court erred in allowing Hamm to give an expert opinion on testatrix’s mental condition since the nursing records he relied upon were not of a type reasonably relied upon by experts in the field in forming opinions or inferences. Defendants suggest that nursing home records may not form the basis of an expert’s opinion because they consist of notations made by unskilled and untrained persons such as nurses aides, activity directors, and social service directors.
 

 In Wilson v. Clark (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, the supreme court held that an expert medical witness could give an opinion based upon hospital records which were inadmissible at trial if the records were of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. The court noted that hospital records were highly reliable. In so holding, the court adopted Federal Rule of Evidence 703. 28 U.S.C. app., Rules of Evid., at 570-71 (1976).
 

 The advisory committee’s comments to Rule 703 indicate that “a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians, and other doctors, hospital records and X-rays.” (28 U.S.C. app., Rules of Evid., Adv. Comm. Notes, at 571 (1976).) Plaintiffs argue that if these sources are embraced within the scope of what can be reasonably relied upon, then nursing home records prepared by nursing home personnel are also within the rule.
 

 We are not prepared to hold that all of those varieties of information listed in the Advisory Committee Note to the Federal Rules of Evidence are always reasonably relied upon by medical experts. We do hold that where the expert indicates that he found the record or information of assistance and that similar records or sources are commonly relied upon in his field, an opinion based upon such may properly be admitted. Specific evidence of unreliability, is a proper subject for impeachment of the expert’s opinion. Here, there is nothing to support the defendants’ suggestions that the nursing home records were prepared by untrained and unskilled persons and contained substantial inaccuracies.
 

 Defendants also assign error to the trial court’s refusal to admit a greeting card, purportedly signed by the testatrix, into evidence. Count III of plaintiffs’ complaint charged that “although the instrument hereinabove referred to was purportedly executed by the decedent, the said decedent did not in fact sign said purported will.” During defendants’ case, they attempted to offer into evidence a- get-well card received by the husband of witness Lois Lashmet in early January of 1980, approximately two weeks after the will in question was signed. The foundation for the card was as follows:
 

 “Q. Have you ever seen Madge write her name?
 

 A. Not for a great many years. I have seen her signature before, because on Christmas cards.
 

 Q. Do you know what it looks like?
 

 A. Well, in the last few years it’s been sorta sprawled out like.
 

 Q. Ma’am, based upon your past association with her and those facts I just asked about, do you have an opinion of whether or not that is the handwriting of Madge Willis?
 

 MR. HELLER: Object for want of foundation.
 

 THE COURT: Let me see the exhibit. Overruled. Go ahead.
 

 Q. And your opinion, Ma’am?
 

 A. It is similar to the ones that she had signed on Christmas cards a year or two before.”
 

 Although the trial court initially overruled the foundation objection, it later refused to admit the card into evidence when plaintiffs objected on the same basis.
 

 There can be no question that an original document which is relevant to the issues and properly authenticated is entitled to admission into evidence, unless a proper ground of exclusion is noted. The parties apparently disagree only with respect to a foundation of au-' thenticity. In Buckingham Corp. v. Ewing Liquors Co. (1973), 15 Ill. App. 3d 839, 305 N.E.2d 278, it was stated that handwriting may be authenticated with proof that a witness is familiar with a putative writer’s handwriting. This familiarity may be gained from having seen the party actually write or from having an acquaintance with the handwriting acquired in the course of business dealings. The court noted that the extent of the knowledge of the witness goes to the weight to be given the opinion and not its admissibility.
 

 We think that the trial court erred in sustaining the objections to the admission of the card. The witness testified to a familiarity with the handwriting of the testatrix as a result of previous correspondence, and any infirmity in her knowledge should have gone to the weight of her conclusion and not the admissibility of the card. We find the error harmless in the instant situation however, since the jury was aware that testatrix did sign her name to the card and there was no dispute that testatrix signed the will, in part. The jury was not required to decide the genuineness of the signature on the disputed will by comparison to the card, and the card’s exclusion could not have prejudiced the defendants. Here, the trial court did not strike the witness’ opinion, but only refused to admit the card into evidence.
 

 Defendants also sought to admit a 1964 will of testatrix into evidence but, upon plaintiffs’ objection, the court refused to admit the same. Defendants cite the rule of O’Day v. Crabb (1915), 269 Ill. 123, 109 N.E. 724, to the effect that it is proper to show the contents of a former will on behalf of the proponents in a will contest case where the former will was drawn along the same general lines as the disputed instrument, in order to show that the testator had a constant and enduring scheme for the distribution of his property and thus to refute the charges of a lack of testamentary capacity or undue influence. Defendants claim that the 1964 will was admissible because it shows a constant and abiding scheme of distribution when compared with the 1979 will.
 

 The 1964 will left all of testatrix’s estate to Mack and Betty Kelly with the exception of $1,000 to plaintiff Aleen Manning. The 1979 will left nothing to the Kellys, who were dead, $3,000 of bank stock to Manning, and the remainder of testatrix’s bank stock to 56 other beneficiaries. Contrary to the defendants’ argument, we conclude that the wills are so dissimilar as to indicate a deviation from prior dispositions. The 1964 will was inadmissible as evidence of a consistent and abiding scheme of property distribution and was properly refused admission by the trial court.
 

 The balance of the issues discussed hereinafter relate exclusively to the issues raised in appeal No. 483 — 0089 by defendant Doris Elaine Blomquist. Defendant Blomquist’s first issue is whether a judgment notwithstanding the verdict should have been granted on count I for the reason that plaintiffs’ proof concerning testamentary capacity was allegedly not related to a time at or near the date the will was executed.
 

 At trial, the principal witnesses presented by plaintiffs on the issue of testatrix’s mental competency were Janet Reisner, Bernice Sharp, Roberta Gray, and Dr. Richard Hamm. Defendant correctly notes that Reisner’s testimony was general in nature and concerned her observations during the last six months of testatrix’s life. On only a couple of occasions did she mention any specific dates. Witness Sharp left the nursing home on November 1, 1979, and all of her testimony concern's a general time period up to that date. Witness Gray’s testimony was likewise related to a general 14-month period during which she was employed at the nursing home. Relying on cases such as In re Estate of Milligan (1972), 4 Ill. App. 3d 38, 280 N.E.2d 244, and In re Estate of Wrigley (1982), 104 Ill. App. 3d 1008, 433 N.E.2d 995, defendant Blomquist contends that plaintiffs’ proof was insufficient as a matter of law, entitling her to a directed verdict or a judgment n.o.v. To entitle the defendant to a directed verdict or a judgment n.o.v., all of the evidence, when viewed in its aspect most favorable to the plaintiffs, must so overwhelmingly favor the defendants that no contrary verdict could ever stand. Pedrick v. Peoria & Eastern R.R. Co. (1967), 37 Ill. 2d 494, 229 N.E.2d 504.
 

 It is well established that the law presumes every person to be sane until the contrary is shown, and the burden of proof rests upon the party who asserts a lack of testamentary capacity. (Shevlin v. Jackson (1955), 5 Ill. 2d 43, 124 N.E.2d 895; Lewis v. Deamude (1941), 376 Ill. 219, 33 N.E.2d 440.) Illinois courts have defined testamentary capacity as having the ability to know and understand the natural objects of one’s bounty, the nature and extent of one’s property, and to make a disposition of property according to some plan formed in the mind. (Quelhnalz; Beyers v. Billingsley (1977), 54 Ill. App. 3d 427, 369 N.E.2d 1320.) To be relevant as evidence of a lack of testamentary capacity, the proof must relate to a time at or near the execution of the will. Shevlin.
 

 We agree with the general rule stated in Milligan and Wrigley but believe that there are sufficient differences between the circumstances at bar to distinguish these authorities. Contrary to evidence in those cases, here the employees observed the testatrix on a daily basis before the will was executed, and their opinions were based on these daily contacts. In several instances the testimony related to specific factual events closely related to December 21, 1979. We think that the opinions were properly admitted and relevant to testatrix’s competency on December 21, 1979.
 

 The supreme court has never established any rule prescribing the relevant time period for evidence of testamentary capacity, but dicta in the case of Mitchell v. Van Scoyk (1953), 1 Ill. 2d 160, 115 N.E.2d 226, indicates that the testimony at issue is sufficiently related to the critical time period. In Mitchell the court noted: “Proof of the mental condition of the testator a reasonable time before or after the execution of the will is competent and will be received when it will tend to show mental condition at the time of the execution of the will. [Citation.] This court has held that proof of the mental condition of the testator two years before the execution of a will was properly received. [Citation.]” 1 Ill. 2d 160,176,115 N.E.2d 226, 235.
 

 Defendant claims that her motion for judgment n.o.v. should have been granted because the plaintiffs failed to prove anything more than that the testatrix suffered from certain physical impairments. Defendant correctly notes that evidence of physical impairment standing alone is insufficient to prove a lack of testamentary capacity. (Tidholm v. Tidholm (1945), 391 Ill. 19, 62 N.E.2d 473; Anthony v. Anthony (1960), 20 Ill. 2d 584, 170 N.E.2d 603.) Defendant suggests that the mere fact that testatrix was disinclined to converse, feeble, unable to move, and incontinent, is insufficient proof of a lack of testamentary capacity. Defendant asserts that plaintiffs’ expert’s opinion is entitled to little weight since he was a paid witness and had never seen the testatrix, unlike Dr. McNeal, who was testatrix’s treating physician. Defendant notes that 11 defense witnesses observed Mrs. Willis near the time the will was executed and testified favorably regarding her mental competence. According to defendant, this overwhelmingly favors her position and no verdict for plaintiffs could ever stand.
 

 It should first be pointed out that when ruling on a motion for judgment n.o.v. or for a directed verdict, neither a trial or reviewing court can consider conflicts in the evidence or questions relating to credibility. (Wrigley.) Plaintiffs’ witnesses testified that testatrix was not capable of formulating a list of 40 to 60 beneficiaries, was not capable of knowing her relatives, and was not aware of the nature and extent of her property. Other witnesses testified that decedent’s business affairs were handled by others, she was not aware of the time of the year, would often sit and stare at the television without expression, seldom communicated, and had difficulty in recognizing persons who worked in the nursing home. We conclude that the trial court acted correctly in submitting the issues to the jury and denying judgment n.o.v.
 

 Defendant Blomquist next charges that the trial court erred in denying her motion for a new trial because the verdict of the jury on the issue of testamentary capacity was against the manifest weight of the evidence. The standard to be applied in reviewing a ruling on a motion for a new trial is whether the trial court abused its discretion or whether its ruling was against the manifest weight of the evidence. (Ryon v. Javior (1979), 69 Ill. App. 3d 946, 387 N.E.2d 936.) A reviewing court will not set aside a verdict merely because the evidence is conflicting, nor can a reviewing court usurp the function of the jury by substituting its judgment for the jury’s in passing on the credibility of the witnesses and the weight to be given their testimony. Butter v. O’Brien (1956), 8 Ill. 2d 203, 133 N.E.2d 274.
 

 We first note that the jury returned a general verdict after being instructed on three possibilities to overturn the will. It is thus not clear from the record whether the jury in fact found that the testatrix lacked testamentary capacity. Nevertheless, we conclude that the evidence is sufficient to uphold the verdict on this ground. We have outlined the evidence of testatrix’s mental capacity above, and cannot say that the jury’s verdict is against the manifest weight of the evidence.
 

 Defendant also assigns error to the trial court’s refusal to direct a verdict on count II of plaintiffs’ complaint. Count II charged that defendant Mock was a fiduciary of testatrix; that testatrix reposed confidence and trust in him, and that Mock devised and procured the execution of testatrix’s last will to secure for himself and others a substantial benefit. At the close of plaintiffs’ case and at the close of all the evidence, the defendant requested a directed verdict on this count which was denied.
 

 The standard for ruling on a motion for a directed verdict or for a judgment n.o.v. is governed by Pedrick. The above recitation of the allegations of count II shows that such count was directed toward the creation of a legal presumption of undue influence. The requisite proof required to raise this presumption consists of a showing that a fiduciary and dominant party in whom testator reposed trust and confidence directly participated in the preparation of a will under which he stands to gain a substantial benefit. (Peters v. Catt (1958), 15 Ill. 2d 255, 154 N.E.2d 280; In re Estate of Basich (1979), 79 Ill. App. 3d 997, 398 N.E.2d 1182.) Defendant Blomquist does not dispute that all of these elements were established except the requirement that a fiduciary receive a substantial benefit under the will. Defendant argues that the benefit must be received by a legatee or devisee and must be substantial. Defendant contends that the 30 shares of stock which Mock would receive under the will is not substantial. We disagree.
 

 The parties agree that the mere fact that defendant Mock receives a fee for services as an executor is not a substantial benefit sufficient to raise a presumption of undue influence. (See Brown v. Commercial National Bank (1969), 42 Ill. 2d 365, 247 N.E.2d 894.) The evidence in the case at bar discloses not only the fact that Mock would receive executor fees, but also that he would receive $3,000 worth of stock. We agree with defendant that $3,000 is not substantial when compared to the total value of testatrix’s estate, but cannot agree that this is the proper comparison to be made. The only issue is whether the $3,000 is a substantial sum in and of itself. We think it is and affirm the trial court’s ruling denying defendant’s motion for a directed verdict.
 

 Defendant contends that the issue of undue influence should not have been submitted to the jury since sufficient proof was presented to rebut the presumption of undue influence as a matter of law. Defendant cites Franciscan Sisters Health Care Corp. v. Dean (1983), 95 Ill. 2d 452, 448 N.E.2d 872, as authority for this proposition. In that case the supreme court held that the presumption of undue influence arising from the fact that decedent’s attorney drafted a will in which he was a substantial beneficiary was rebutted as a matter of law on proof of, inter alia, the long-term personal relationship between the attorney and the decedent and the circumstances of its execution which disclosed the decedent had obtained independent legal advice. Unlike Franciscan Sisters, very little evidence was presented showing the circumstances of the will’s execution and to show defendant Mock’s relationship with the testatrix. What proof was presented was insufficient to negate the presumption as a matter of law. Moreover, when the presumption is rebutted, the trier of fact must still decide the issue of undue influence upon the whole of the evidence. Rebutting the presumption of undue influence does not take the issue from the jury where conduct, apart from the fiduciary relationship, is relied upon to show undue influence. (Franciscan Sisters.) The trial court correctly denied defendant’s motion for a directed verdict on count II.
 

 Defendant Blomquist also argues that error was committed in denying her motion for a directed verdict on count III of the plaintiff’s complaint. This count alleged that decedent did not in fact sign the will. The uncontradicted evidence shows that testatrix was given the will and a pen, signed her first name, had difficulty in continuing to write, and was assisted by Ina Green, a beneficiary under the will, in signing her name. Green stated that she either steadied or guided the pen, after she realized that testatrix was having difficulty in writing. Relying on In re Estate of Weaver (1977), 50 Ill. App. 3d 223, 365 N.E.2d 1038, defendant contends that no verdict could ever stand on count III. We believe the trial court properly denied defendant’s motion, but it is unnecessary to decide this issue, since the trial court’s judgment is fully supported by the other grounds of invalidity which we have discussed.
 

 The final issue raised by defendant Blomquist is her contention that the trial court erred in denying defendant Mock’s motion for post-trial discovery. We treat this issue as waived, since Blomquist never moved for post-trial discovery, and defendant Mock has not challenged the trial court’s denial of his motion on appeal. Wells v. Web Machinery Co. (1974), 20 Ill. App. 3d 545, 315 N.E.2d 301.
 

 For the foregoing reasons, the judgments of the circuit court of Coles County are affirmed.
 

 Affirmed.
 

 WEBBER, P.J., and MILLS, J., concur.