ROY KUSTER, Plaintiff-Appellant, v. JOAN SCHAUMBURG *et al.*, Defendants-Appellees.

Fourth District   No. 4—95—0091

Argued September 14, 1995.—Opinion filed October 31, 1995.—Rehearing denied January 5, 1996.

Edward Zukosky (argued), of Wenona, and William C. Zukosky, of Urbana, for appellant.

, James P. Ginzkey (argued), of Hayes, Hammer, Miles, Cox & Ginzkey, of Bloomington, for appellees.

JUSTICE COOK delivered the opinion of the court:

Raymond Jacobs died testate in May 1991, leaving an estate worth an estimated $1.6 million. Plaintiff Roy Kuster, his nephew, brought this action contesting the testator's last will, alleging (1) that the testator lacked the requisite capacity, (2) that the will was not properly witnessed by two credible witnesses, and (3) that the will was the product of undue influence. The jury found for the proponents of the will, and the court entered a verdict against plaintiff. Plaintiff appeals, raising four issues: (1) whether the proponents failed to rebut the presumption of undue influence and whether plaintiff is entitled to judgment *n.o.v.* on the ground of undue influence; (2) whether plaintiff is entitled to judgment *n.o.v.* on the ground that decedent lacked testamentary capacity; (3) whether in the alternative plaintiff is entitled to a new trial based upon the weight of evidence; and (4) whether in the alternative plaintiff is entitled to a new trial because of the erroneous admission of evidence on irrelevant and collateral matters. We affirm.

## I. FACTS

Raymond Jacobs (testator) had four sisters, Mabel Jacobs Kuster, Lidyia Jacobs, Milda Jacobs Armes, and Viola Jacobs Kiper. They each inherited farmland near Chenoa, Illinois, from their parents. The testator's share was 120 acres. The testator farmed this land until the 1960's, when he met Arthur Schaumburg. Arthur started working testator's land (as well as some of the sisters' land) as a tenant farmer, and the testator became very close friends with Arthur, his wife, defendant Joan Schaumburg, and their son, defendant Brian Schaumburg. Brian continues to farm the land today.

Defendant Richard J. Dalton was the testator's attorney. In 1977, Dalton drafted a will for the testator. The 1977 will granted testator's sister Lidyia a life estate in his farmland. Upon her death, the land was to pass in trust with the income therefrom to be paid, per capita, to each of the testator's nieces and nephews. The trust was to expire in 20 years, when the corpus was to be liquidated and paid in equal shares to the testator's nieces and nephews. However, plaintiff's and Gladys Kiper White's shares were to be held in a spendthrift trust, income payable to each, with the principal being paid to their children upon their deaths. Dalton, Arthur, and Joan were nominated as cotrustees and coexecutors. Three days after executing the will, the testator executed a codicil to the will providing that the trustees were allowed to rent the farmland and could also purchase the land upon the expiration of the trust. The lease terms for the land were to be similar to those for other leased land in the area, and, in the event a trustee bought the land, it was to be appraised by two independent appraisers.

In 1979, the testator executed a second codicil to the 1977 will. This codicil granted the trustees the power to sell the land during the period of the trust if it was in the best interests of the trust and the beneficiaries. The second codicil also changed the terms of plaintiff's interest. The one-sixth income from the trust that plaintiff was to receive was redistributed as follows: one-third of it was to be paid to Larry Phillis; one-sixth of it was to be paid to Gary Kuster; and plaintiff was to receive $100 in income. The remaining amount of plaintiff's share was to be paid equally to plaintiff's children.

In 1982, an agency agreement was written, but remained unsigned. The agreement provided that Arthur was to become manager of all testator's farmland. The agreement stated that testator was to have no management duties and called for the creation of an account upon which Arthur could draw checks to pay all of the farming operation's expenses.

The testator created a power of attorney in Arthur and Joan,

which gave them the power to collect income, pay bills, lease and sell real estate, draw on all of his bank accounts, *et cetera*. The proponents claim that testator wrote another will in 1985 which was destroyed when he had his will rewritten in 1988.

In 1988, the testator had Dalton draft another will, signed and dated January 8, 1988. In this will, testator left plaintiff $500. The testator also established a trust for a duration of 12 years, income payable to four of testator's six nieces and nephews. The fifth clause reads:

> "I *** am fully aware that I have two nieces and nephews not named above, to-wit: Gladys Kiper White and Roy Kuster. I am also fully aware that each of them have [*sic*] seven children. Other than the $500.00 bequest hereinfore provided for each of them and their children, it is my intent to omit them from this my Last Will and Testament."

The will nominated Dalton, Arthur, and Joan to serve as cotrustees and coexecutors.

Eighteen subparagraphs in the will gave the cotrustees broad powers. These powers included the power to plant and harvest crops, to purchase and sell equipment, and to lease the property to themselves or others. The trustees were also given the "right to deal with the trust the same if [*sic*] if they were strangers and the fact that they are named trustees shall in no way prohibit them from leasing farmland from the trust or buying farmland from the trust." Any lease was to be a crop-share lease "on the basic 50-50 arrangement similar to other crop[-]share leases in the community." If a trustee or a relative of a trustee wanted to purchase the land, the price was to be determined by two independent appraisers. The 1988 will was witnessed by Dalton and his legal secretary, Dorothy Kirkton.

In late August 1988, the testator fell at his house and was found on the floor 12 hours later by Arthur and Joan. He was taken to the hospital where he was admitted with diagnoses of weakness in the lower extremities, a right ankle fracture, severe chronic degenerative arthritis of the lumbar spine, muscle necrosis, myoglobin anemia, and arteriosclerotic heart disease. He was in the hospital until September 15, 1988, when he was admitted to the Meadows Mennonite Nursing Home (Meadows) in Chenoa, Illinois. He remained at Meadows until his death in 1991.

On September 6, 1988, while he was in the hospital, the testator executed an Illinois statutory short-form power of attorney for health care. Joan was appointed, and Joan was the one who took care of all the paperwork in getting the testator admitted to Meadows.

On May 18, 1990, the testator executed a codicil to the 1988 will, providing that Brian was to replace his recently deceased father, Arthur, as coexecutor of the 1988 will. The 1990 codicil was also witnessed by Dalton and Kirkton.

At trial, plaintiff introduced evidence that the 1988 will could not have been executed on January 8, 1988. This evidence consisted of a letter, dated January 10, 1988, written by the testator to Floyd Kiper and his wife June. Floyd is testator's nephew and is a substantial beneficiary under the 1988 will. The pertinent part of the letter reads, "[Arthur] Schaumburg spent quite a little time at Daltons in Gridley Friday on my will changing some things."

Another letter introduced by the plaintiff was written by Dalton and addressed to Joan. It is dated May 2, 1990, and reads:

> "I enclose herewith two copies of the Property Power of Attorney and the Health Power of Attorney in which he [testator] has substituted Brian for [Arthur] as successor attorney.
>
> I will tell you that I have prepared and he [(the testator)] has executed a third codicil to his will whereby he substitutes Brian for [Arthur] as co-executor under his will.
>
> I am concerned about [(the testator's)] original will and the first and second codicil being in his safe deposit box at the bank. There is a possibility and even a strong probability that someone like [plaintiff] might be admitted to and given access to the box immediately after [the testator] dies. For that reason, I think it is a good idea if you get the original will dated the 11th day of November, 1977, the first codicil thereto dated the 14th day of November, 1977, the second codicil thereto dated the 20th day of April, 1979, out of the box and bring them over and I will put them in my office safe. I discussed this with [the testator], and he has asked me to do this. If you have any questions about this, please call me."

Plaintiff argues that the "third codicil" referred to in the letter apparently refers to the 1979 will, not the May 18, 1990, codicil, and that the 1988 will was apparently not yet in existence. Plaintiff points out that the codicil that substitutes Brian as coexecutor for his deceased father was executed on May 18, 1990, 16 days after Dalton's letter to Joan was written.

## II. UNDUE INFLUENCE

Undue influence has been defined as " 'any improper *** urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely.' " (*Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 460, 448 N.E.2d 872, 875, quoting *Powell v.*

*Bechtel* (1930), 340 Ill. 330, 338, 172 N.E. 765, 768.) To set aside a will, the undue influence " 'must be of such a nature as to destroy the testator's freedom concerning the disposition of his estate and render his will that of another.' " *Franciscan Sisters*, 95 Ill. 2d at 460, 448 N.E.2d at 875, quoting *Breault v. Feigenholtz* (1973), 54 Ill. 2d 173, 181, 296 N.E.2d 3, 9.

Plaintiff argues that "defendants failed to rebut the proven presumption of undue influence." It is true that the proponents have failed to rebut any presumption, but that was not the issue submitted to the jury in this case. The court gave Illinois Pattern Jury Instructions, Civil, No. 200.03 (3d ed. 1990) to the jury, and the jury found the facts to be in favor of the proponents. The issue submitted to the jury was whether plaintiff had proved the basic facts on which the presumption depended. If the jury so found, it was instructed to render a verdict that the document was not the valid last will of the testator. If the court had decided the proponents had presented evidence sufficient to rebut the presumption, the presumption would have disappeared from the case, the court would not have given an instruction on it, and the case would have proceeded to the jury on specific evidence of actual undue influence. Illinois Pattern Jury Instructions, Civil, No. 200.03, Comments, Procedural Effect (3d ed. Supp. 1994) (hereinafter IPI Civil 3d).

The jury was instructed as follows:

"To establish undue influence as a ground of invalidity, the plaintiff must prove each of the following propositions:

1. That there was a principal-agent, attorney-client, or other fiduciary relationship between Arthur Schaumburg, Joan Schaumburg, Brian Schaumburg and Richard Dalton, or one or more of them, and Raymond Jacobs, whereby one or more of them exercised dominance over Raymond Jacobs and Raymond Jacobs was dependent upon one or more of them;

2. That Raymond Jacobs reposed trust and confidence in Arthur Schaumburg, Joan Schaumburg, Brian Schaumburg and Richard Dalton or one or more of them;

3. That Richard Dalton, Arthur Schaumburg, Joan Schaumburg, or one or more of them, prepared or caused the preparation of the document purporting to be the last Will of Raymond Jacobs.

4. That Arthur Schaumburg, Joan Schaumburg, Brian Schaumburg and Richard Dalton or one or more of them received a substantial benefit under the terms of the document, when compared to other persons who have an equal claim to Raymond Jacob's bounty.

If you find that each of these propositions has been proved, your

verdict should be that the document is not the valid last Will of Raymond Jacobs.

If you find that any of these propositions has not been proved, then your verdict should be that the document is the valid Last Will of Raymond Jacobs, unless the Plaintiff has proved one of the other alleged grounds of invalidity."

See IPI Civil 3d No. 200.03.

■ The primary question in this case related to proposition four, whether the proponents received a substantial benefit under the will. The mere fact that an attorney or confidential friend who writes the will is named executor or trustee does not alone raise a legal presumption of undue influence. (*Breault*, 54 Ill. 2d at 182, 296 N.E.2d at 9.) However, where an executor or trustee is given special benefits and powers by the will, a jury question may be raised whether he has received a substantial benefit. (*Gum v. Reep* (1916), 275 Ill. 503, 114 N.E. 271; *Teter v. Spooner* (1917), 279 Ill. 39, 116 N.E. 673.) The trial court in this case properly decided that this question was one for the jury. Plaintiff has presented no sufficient argument that the jury's decision was contrary to the manifest weight of the evidence, let alone that a judgment *n.o.v.* should have been entered. Plaintiff does not cite any authority for the proposition that the trial court should have found substantial benefit as a matter of law, and *Gum* and *Teter* hold the contrary.

It is true that the trustees had the right to farm the land during the period of the trust, but any lease was to be on the typical 50-50 crop-share arrangement, and the trustees' activities would be subject to the control of the court. The trustees had the right to purchase the property, but the price was to be determined by independent appraisers, and again any sale would be subject to the control of the court. These same provisions had been included in previous wills of the testator, prepared over a span of many years, some of which made substantial provision for plaintiff. The jury's apparent decision there was no substantial benefit in the will for the proponents was well within the evidence.

Looking to the specific facts of this case, we cannot say that the verdict was contrary to the manifest weight of the evidence. Plaintiff relies most heavily upon two letters regarding the 1988 will and its codicil: one written by the testator, the other written by Dalton. It could be that the jury simply chose to believe the testimony of the proponents and their witnesses. Dalton stated that the letter was full of mistakes. He said that he made a mistake in referring to the 1990 codicil as a third codicil because he had been looking at another file.

The jury could have found that the 1988 will that left plaintiff

only $500 was consistent with the 1979 codicil to the 1977 will that bequeathed $100 a year to the plaintiff. It appears that plaintiff was not a favored relative even in 1979. There was testimony of animosity that the testator felt toward plaintiff, and that the testator referred to plaintiff as a "rascal."

Furthermore, the jury could easily have concluded that the testator made an error in the letter he wrote to the Kipers. As noted above, the pertinent part of the letter reads, "[Arthur] Schaumberg spent quite a little time at Daltons in Gridley Friday on my will changing some things." The jury may have concluded that the testator meant to write, "[Arthur] Schaumberg *and I* spent quite a little time at Daltons in Gridley Friday on my will changing some things." Dalton's secretary testified that Arthur drove the testator to Dalton's office and sat in the waiting room on several occasions.

### III. TESTAMENTARY CAPACITY

Next, plaintiff argues that he is entitled to a judgment *n.o.v.* on the issue of testamentary capacity. The law presumes every person is sane until the contrary is shown. The burden of proof is on the party who asserts the lack of a testamentary capacity. (*Manning v. Mock* (1983), 119 Ill. App. 3d 788, 804, 457 N.E.2d 447, 456, citing *Shelvin v. Jackson* (1955), 5 Ill. 2d 43, 124 N.E.2d 895; *Lewis v. Deamude* (1941), 376 Ill. 219, 33 N.E.2d 440.) Testamentary capacity has been defined as "the ability to know and understand the natural objects of one's bounty, the nature and extent of one's property, and to make a disposition of property according to some plan formed in the mind." (*Manning*, 119 Ill. App. 3d at 804, 457 N.E.2d at 456.) To be relevant, evidence of a lack of testamentary capacity must relate to a time at or near the execution of the will. (*Manning*, 119 Ill. App. 3d at 804, 457 N.E.2d at 456.) Although the relevant time period has not been defined, the supreme court has held that proof of the mental condition of a testator two years before the execution of a will was properly received. *Manning*, 119 Ill. App. 3d at 805, 457 N.E.2d at 457, citing *Mitchell v. Van Scoyk* (1953), 1 Ill. 2d 160, 176, 115 N.E.2d 226, 235.

Plaintiff presented two witnesses that testified that the testator was not of sound mind and body. The first, Gary Keen, is one of testator's "grandnephews." The second, Donna Blankenship, is Gary's sister. Their mother, Gladys Kiper White, was a niece of the testator. She, like plaintiff, was left only $500 in the testator's will. Although Gary and Donna do not have a direct interest in the will, their mother, as an heir of the testator, would stand to gain considerably if the will were not admitted to probate. Both witnesses testified that in late 1987, they visited the testator, and that he did not seem to recog-

nize them. There was testimony that his clothes looked as though they had not been changed in some time. There was testimony that he seemed to be in a dazed or daydream-type state. Both concluded that the testator was not of sound mind and memory.

The proponents presented evidence to the contrary. While some of the witnesses' testimony was general in nature, most of the witnesses had known the testator for several years. His banker, Thomas Kahle, testified that the testator had very sound business practices and that he was very competent when it came to business matters. He believed that the testator was of sound mind and memory in 1988. Charles Kauffmann, the testator's fertilizer salesman, testified that he had business dealings with the testator for several years. The two of them talked about the different results one would gain from the use of different fertilizers and soil compositions. He stated that he believed the testator to be of sound mind and memory. Ron Ackerman, the testator's neighbor, stated that he had known the testator since he was a little boy. Although he failed to directly state that the testator was of sound mind and memory, he gave a narrative about their conversations during the summer of 1988 from which a jury could reasonably infer that the testator had all of his mental faculties.

Cheryl Stevens, a nurse at Meadows, testified that when the testator was admitted to the nursing home, he was able to answer questions appropriately, that he knew who he was and where he was. She also stated that the testator recognized his visitors, that he knew his family, that "he would know" of his property, and that he was able to make decisions. Mary Kaufman testified that the testator was confused when he was admitted to Meadows on September 15, 1988, but that, due to the recent trauma and hospitalization, such a reaction was not uncommon in patients who were being admitted. She also testified about a "mini mental exam" she administered to the testator about $2^{1}/_{2}$ years after the 1988 will was written and four months after the 1990 codicil was executed. The testator scored 25 out of 30 points on that exam. Kaufman said that the five points he missed were common errors made by individuals taking the exam. She rated him as being alert and testified that as of that date, September 6, 1990, the testator was of sound mind and memory. Looking at the facts of the instant case, we cannot say that the evidence, when viewed in the light most favorable to the proponents, was contrary to the manifest weight of the evidence.

## IV. IRRELEVANT AND COLLATERAL EVIDENCE

Finally, the plaintiff argues that the trial court committed re-

versible error in admitting evidence concerning an alleged check incident that occurred between plaintiff and his mother in 1950. Plaintiff argues that the admission of this evidence was irrelevant, prejudicial, and inflammatory since "the Defendants in this case presented no evidence that [the testator] ever expressed an intention to actually disinherit [plaintiff] for any reason or that [plaintiff] was ever alienated from [the testator]." We disagree.

First, we note that the testator did not disinherit plaintiff. He simply left him a sum that is small relative to the size of the testator's estate and to what would be the plaintiff's intestate share. Evidence was admitted at trial that the testator did not think well of the plaintiff. There was testimony to the effect that the testator thought that the plaintiff was "no good" and a "rascal." The testator complained to his banker that plaintiff "spends every dime he can get his hands on." The testator had told Nancy Hoobler, Dalton's secretary, that plaintiff did not know how to manage money. The testator spoke to Kirkton, Dalton's other secretary and witness to testator's will, that plaintiff had stolen from and cheated his mother. Kirkton also testified that the testator had complained that "[plaintiff's] been over and wanted money again. I just couldn't give it to him *** he blew up."

From the record, it is clear that there was some animosity between the plaintiff and the testator. Some of this no doubt grew out of the 1950 check incident. Plaintiff's mother, Mabel, was then living with her brother, the testator. Mabel had written a check to plaintiff for $5. Plaintiff altered the face of the check to read $500 and cashed it. Plaintiff was arrested and charged, although he was never convicted of the crime.

■ We hold that the trial court did not abuse its discretion in admitting this evidence. Evidence of the relationship between the testator and a person included or excluded is relevant in a case charging that the will is the product of undue influence or is invalid due to a lack of testamentary capacity. (See *Mitchell*, 1 Ill. 2d at 177-78, 115 N.E.2d at 235; *Powell*, 340 Ill. at 339, 172 N.E. at 769.) The evidence offered by the proponents goes to the relationship between the testator and the plaintiff. It also reveals the source of the testator's belief that the plaintiff was irresponsible in handling money. While it is true that the evidence offered does not paint a flattering picture of the plaintiff, we do not find this evidence to be unfairly prejudicial.

Plaintiff also argues that this evidence was inadmissible under *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, in that evidence of a conviction is not admissible to impeach a witness if 10 or more years have elapsed. *Montgomery* does not apply directly to

this case, and we see no reason to create a similar rule which would apply. We conclude that the trial court did not commit reversible error in admitting this evidence.

## V. CONCLUSION

For all of the foregoing reasons, we affirm the ruling of the trial court.

Affirmed.

GREEN and GARMAN, JJ., concur.