J. F. EQUIPMENT, INC., Plaintiff-Appellee, v. OWATONNA MANUFAC-
TURING COMPANY, Defendant-Appellant.

Second District   No. 85—0062

Opinion filed April 22, 1986.

Charles E. Helsten and Stephen R. Swofford, both of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, for appellant.

Jan H. Ohlander and R. Jerome Pfister, both of Reno, Zahm, Folgate, Lindbert & Powell, of Rockford, for appellee.

JUSTICE STROUSE delivered the opinion of the court:

The plaintiff, a dealer of light construction equipment, sued the manufacturer of the equipment and a competing dealer in a two-count complaint. Count I was for breach of the plaintiff's dealership contract with the manufacturer, and count II was for conspiracy to breach the dealership contract. The competitor settled its claims with plaintiff for $7,500 before trial. The jury found the manufacturer guilty of conspiracy (count II) to breach a contract, but made no finding as to count I. The jury awarded $64,000 compensatory damages and $159,000 punitive damages. The trial court entered judgment on the verdict and, after defendant's post-trial motions were denied, the manufacturer appealed.

The plaintiff, J. F. Equipment, Inc. (J.F.), is an Illinois corporation which is a dealer of light construction equipment. The defendant, Owatonna Manufacturing Company, Inc. (OMC), is a Minnesota corporation which manufactures, among other things, a line of four-wheel-drive end loaders (called Mustangs), which comes in eight or nine different models, ranging in price from $6,000 to $60,000.

Prior to starting J.F., Joseph Fiorenza was vice-president and general manager of Fiorenza Material Handling Company (FMH). Through his efforts with FMH, Fiorenza became a top Clark Manufacturing Company Bobcat line salesman. Bobcat end loaders are virtually identical to Mustangs. FMH was the Bobcat dealer for approximately 3½ years. Bobcat terminated FMH's dealership, due to personality conflicts between FMH's president (Joseph Fiorenza's brother) and Bobcat's territorial sales representative. After losing the Bobcat distributorship, FMH took on OMC's Mustang line in 1977. Due to internal FMH restructuring, Fiorenza was transferred to an inside management position. Because Fiorenza was inside, FMH sales of the OMC line were minimal. Explaining his desire to go into business for himself, Fiorenza negotiated with his brother, and they agreed to trade Fiorenza's 20% ownership in FMH for the OMC in-

ventory in stock at FMH. For his exchange of stock, Fiorenza received $6,000 in parts, one used Bobcat, one used Mustang, and three new Mustangs. FMH agreed to allow J.F. to operate from the premises of FMH, utilizing its parts department and certain personnel.

On July 14, 1980, Joseph Fiorenza, president of J. F. Equipment, Inc., contacted OMC's territorial sales manager, Richard Collins, proposing that J.F. become the Rockford area OMC dealer. Collins was very receptive to the idea, and on August 20, Collins and Fiorenza flew to OMC's Minnesota offices. While preliminary concerns were expressed about Fiorenza's support staff, location and financial strength, OMC's regional sales manager, credit manager and warranty manager approved of Fiorenza's proposal. After leaving Owatonna, Fiorenza and Collins entered into a verbal agreement for Fiorenza to be an OMC dealer in the Rockford area. On September 1, 1980, Collins notified the OMC main office of this contract.

The terms of the contract were disputed by the parties. Fiorenza testified that the contract was for a one-year minimum term wherein he would be the exclusive dealer of the OMC full line for the Rockford area and that the dealership contract could not be terminated at will. It would be automatically renewed annually unless OMC terminated it for cause. Fiorenza noted that a termination for cause could occur through (1) obvious financial default; (2) by failing to adequately market the product; or (3) failing to purchase equipment from OMC. Collins testified that OMC does not grant either exclusive or set term dealerships. OMC's regional sales manager testified that he had no knowledge of an exclusive dealership, but that if one were proposed, the corporation would not have approved it. He further testified that many cities have more than one dealer.

On September 15, 1980, Fiorenza submitted credit applications and received a standard credit agreement from OMC. While this credit agreement was terminable by 30 days' prior written notice, the termination of the credit agreement contained language anticipating it would continue for a one-year term. Fiorenza had already sold one end loader.

While Fiorenza's operation was getting underway, the Eighmy Equipment Company (EEC), a competing distributor of several lines of light and heavy construction equipment, was notified by Clark Manufacturing that it was terminating EEC's Bobcat dealership. EEC had marketed Bobcat equipment in the Rockford, Peoria and Decatur areas. In order to prevent loss of sales and service staff essential to an ongoing construction equipment sales business, Eighmy needed, and determined to get, an OMC dealership as quickly as possible for

all three areas.

In October, Eighmy made several telephone calls to OMC's regional sales manager in Minnesota and asked him to consider the possibility of EEC becoming the OMC dealer in Peoria, Rockford and Decatur. The OMC regional manager informed Eighmy that J.F. was the existing dealer in Rockford, but that he would instruct his territorial manager to contact Eighmy. Collins and Eighmy had two or three conversations in October and early November. Eighmy testified that at some point during these discussions the existing Rockford dealership was discussed. Collins acknowledged these conversations and testified that he made it very clear to Eighmy that Rockford had a dealer and that the subject was closed as to an EEC dealership in Rockford.

On November 6, 1980, a contingent of EEC sales persons flew to Minnesota with Collins and Eighmy. It was explained during these conversations that OMC had dealers in Peoria and Decatur who were not performing, but Eighmy was not made aware of any problems in Rockford. From a general business standpoint, it was Eighmy's practice to negotiate for exclusive industrial territory. This meant that while he would not be concerned with dealers of the same manufacturer dealing in farm or agricultural equipment, he would be concerned if OMC had another industrial dealer in his vicinity. Collins also testified that it would be impossible to have two full-line, industrial dealerships in Rockford.

Collins testified that on November 21, 1980, he and Eighmy had a meeting documented on a "dealer call report." A dealer call report is a document prepared by a territorial sales manager to document each visit with the dealer. If there was another call report in this dealer's file, the manager would customarily use the date from the top of the preceding call report for the date of the last call on the current call report. Collins' call report of December 15, 1980, documented the November 21 meeting with Eighmy as the date of his last call. Neither Collins nor OMC could produce that actual call report for November 21, which would indicate what discussions took place on that date.

Two days later, on November 23, Collins met with Fiorenza and informed him that OMC was cancelling the J.F. dealership. He wrote a dealer call report documenting the cancellation due to (1) lack of performance; (2) poor market penetration; (3) dilution of sales effort (advertising rebuilt machines of competitors); and (4) prospects for a better performance with a new dealer. To substantiate the first two reasons for cancelling the dealership, Collins testified that J.F. had sold only one OMC machine since the beginning of the dealership.

Fiorenza testified, on the other hand, that the dealership had been in existence for only 2½ months and that such period of time is insufficient to judge performance or market penetration. This, he stated, was especially true in light of the timing of construction business sales. As his dealership began in September, when the construction industry is at its slowest, it would not be abnormal to have low sales. In light of that, he added that he had sold one new Mustang, one used Mustang, and one used Bobcat and that he had already quoted $200,000 worth of OMC equipment of which 60% to 80% would be sold within the next three months for the spring construction season. Even Eighmy testified that 2½ months would not be sufficient time in which to reach potential customers or judge a dealership's performance.

Collins testified to the third reason for canceling the dealership, stating that he disapproved of J.F. advertising rebuilt Bobcats. He stated that the Mustang name didn't appear prominently in any advertising or on any vehicles that were used in the business. He contended that dealers should not advertise completely rebuilt Bobcats, "like new," with a much lower price than its Mustang equivalent. In his letter notifying Fiorenza of the dealership cancellation, OMC's regional sales manager noted, "I might also add the fact that you have advertised Bobcat loaders for sale in the Rockford area was certainly not considered in good taste as far as we were concerned and this was also considered in making the decision." Fiorenza objected, charging that the claim was false and fabricated. He testified that it was common practice in the industry for dealers to advertise used competitive equipment. When called to the stand, OMC's regional sales manager admitted it would not be unusual for an OMC dealer to advertise used or rebuilt Bobcats. Eighmy also concurred that this was common practice and that from the beginning of his dealership he would advertise rebuilt Bobcats and OMC products on an ongoing basis, and that OMC was aware of this. The record also shows that OMC knew, from J.F.'s inception, that J.F. would be advertising new and used rebuilt Bobcats on an ongoing basis and, in fact, OMC paid for J.F.'s initial announcement which made reference to this.

On November 24 OMC offered the Rockford dealership to EEC. On November 28, Fiorenza received a letter from OMC's regional manager documenting the termination and responded that he did not accept the cancellation and that such action was a breach of their dealership contract.

On December 15, Fiorenza called OMC to inquire about credit for the inventory which remained in his warehouse. OMC repurchased all

OMC equipment from Fiorenza, even the obsolete stock which Fiorenza had received from FMH.

In late December, Fiorenza met with Eighmy in order to discuss the sale and purchase of several pieces of remaining used equipment. Fiorenza testified that Eighmy stated that he was very sorry to have put J.F. out of business and he offered Fiorenza a sales position with EEC. Fiorenza stated that Eighmy admitted it would be hard for Fiorenza to work for "a guy who put you out of business, but I would like to have you keep it in mind and don't give me an answer now." Fiorenza further related that Eighmy admitted having dangled the chain and tempted Owatonna by telling them that he needed all three locations.

Months after this meeting, on April 5, 1981, Eighmy wrote a letter to OMC's regional sales manager confirming the discussion with Collins which took place prior to EEC's contract with OMC. It was agreed in the correspondence that Collins would handle the cancellation. Eighmy acknowledged on the stand that this was intended as a "cover-your-butt letter."

As to compensatory damages, J.F.'s accountant testified that J.F. lost approximately $13,892 in lost start-up costs and testified to a loss of $31,251 for lost profits for 1981. He based this on anticipated sales of $543,000, which would reflect the sale of 18 new units and 17 used units. At the outset of the J.F. dealership, Collins anticipated at least $300,000 worth of sales from Fiorenza. When Fiorenza last actively sold this type of equipment, he sold an average of 16 to 25 units per year. He further projected that J.F. would have lost $130,000 in the next four years. OMC contested the lost-profits amount based on the fact that the projection did not reflect that Fiorenza had only averaged selling 16 units per year when he sold the more popular Bobcat model in much better economic times. OMC argued that the economy in the Rockford area was bad in 1981 and construction was minimal.

J.F. also argued that they were entitled to punitive damages due to the wilfulness and conscious disregard that OMC and EEC exhibited toward J.F.'s contractual rights and business commitments in their conspiracy to breach the dealership contract. As to punitive damages, J.F. introduced evidence that OMC's net worth for the year ending August 31, 1982, was $5,574,570. For the year ending August 31, 1983, it was $2,652,238.

The jury rendered a verdict in the amount of $64,000 in compensatory damages and $159,000 in punitive damages. After the trial court denied the defendant's post-trial motions and granted a setoff of EEC's settlement against the punitive damages, the defendant did

not file a motion to reconsider the setoff but proceeded with this appeal.

OMC first argues that the jury's verdict in finding a conspiracy to breach the contract was against the manifest weight of the evidence. *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, holds that, to prove a defendant liable for conspiracy, a plaintiff must prove an agreement of two or more persons to do an unlawful act or to do a lawful act by unlawful means. OMC then cites *John Deere Co. v. Metzler* (1964), 51 Ill. App. 2d 340, 355, that the gravamen of a civil conspiracy is not the agreement, which by itself will not support liability, but the unlawful act committed pursuant to the agreement. In the instant case, OMC argues that the jury's finding of guilt was against the manifest weight of the evidence because (1) J.F. failed to establish any wrongful conduct by OMC because OMC cancelled the dealership "for cause"; and, (2) there was a *total* failure of proof of an agreement between OMC and EEC to breach J.F.'s contract.

We dispose of OMC's first argument—that there was no wrongful act—by observing that the facts were contested and the jury found against OMC. OMC argues that since the jury failed to return a verdict finding OMC guilty of breach of contract on count I, the verdicts are inconsistent and should be reversed. (See *Wottowa Insurance Agency, Inc. v. Bock* (1984), 104 Ill. 2d 311, 316.) A blank finding on a jury verdict form is not tantamount to a finding of not guilty where the jury verdicts deal with multiple-count complaints. (*Martin v. McIntosh* (1976), 37 Ill. App. 3d 526.) In a multiple-action trial, if a jury returns a verdict on one action but is silent as to others, the court will, if the manifest intent of the jury is sufficiently certain, make the verdict conform to the intention and carry the findings into effect as to the other action. (*Sesterhenn v. Saxe* (1967), 88 Ill. App. 2d 2, 11.) There was no misconception of the intent of the jury here. The trial court expressly found that the jury's intention was clear.

To support its second argument, OMC relies on the absence of any direct testamentary evidence pointing to a verbal agreement to breach J.F.'s dealership contract. OMC admits that EEC sought to represent OMC as a dealer but denies any inducement or agreement to wrongfully terminate J.F. OMC asserts EEC had a privilege whereby it, as a business competitor, could advance its own interest by entering into a business relationship with OMC, even though it would thereby adversely affect J.F. (*Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 549.) This was the extent of EEC's activities. Since EEC was not involved in any alleged conspiracy and since

a party cannot conspire with itself (*John Deere Co. v. Metzler* (1964), 51 Ill. App. 2d 340, 355), OMC should not be held liable for conspiracy. OMC also argues that any evidence must be clear and convincing, and "if the facts and circumstances relied upon are as consistent with innocent conduct as with guilt, it is the duty of the court to find that the conspiracy has not been proved." *Bimba Manufacturing Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 267.

■ In determining whether a jury's verdict is against the manifest weight of the evidence, the inquiry on appeal is whether the result reached is reasonable on the facts and evidence and not whether other conclusions are possible. (*Nunley v. Village of Cahokia* (1983), 115 Ill. App. 3d 208, 214.) *ABC Trans National Transport, Inc.* discusses the elements of the tort of civil conspiracy:

> "The essence of a conspiracy is the combination of two or more persons to accomplish an illegal object or to accomplish a legal object by illegal means. [Citation.] In this case, the actionable conduct was defendants' intentional or conscious plan to act, in concert, in such a way as to breach a duty and injure their employer, ABC. Actual 'malice' or ill-will is unnecessary. [Citation.] Hence, defendants' motives do not excuse their liability." *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*(1980), 90 Ill. App. 3d 817, 826.

In *Dymek v. Nyquist* (1984), 128 Ill. App. 3d 859, the court held that the principal element of the tort of conspiracy is not the agreement between the parties which caused the wrong, but the wrongful act in pursuance thereof that results in damage.

The plaintiff has offered credible evidence which, when viewed in its totality, could lead to the conclusion that defendant wrongfully terminated its dealership with plaintiff. OMC and EEC had secret meetings to establish an EEC dealership in Rockford after the contract with J.F. and while J.F. was making substantial investments of money and time in reliance upon the contract. EEC and OMC knew that the Rockford area could not support two OMC dealerships, and EEC knew that it was pressing to have the same manufacturer for all three of its dealer locations. Eighmy demanded the OMC contract for all three locations. J.F., totally unaware of all this, continued to work to create a dealership in Rockford. The first and only indication of any problem occurred on November 23, 1980, when Collins gave J.F. notice of cancellation. The next day OMC offered EEC the Rockford dealership. J.F. contends the evidence points to the fact that the reasons cited by OMC in its attempt to terminate J.F. for cause were untrue and did not constitute actual cause. Finally, Eighmy's letter of

April 1, 1981, was admittedly a "cover-your-butt letter" in which it seems he was attempting to cover his tracks as a participant in the wrongful termination. In the letter he admits that he knew of J.F. prior to J.F.'s cancellation and prior to entering into his own contract. It also confirms a "secret" discussion prior to November 24, 1980, during which it was agreed that it would be Collins' job to "handle" the J.F. termination.

There was circumstantial evidence from which it could be concluded that EEC combined with OMC to wrongfully terminate J.F.'s contract. While such evidence was not direct testimonial evidence, there was sufficient evidence offered on which the jury could base a guilty verdict. The jury alone must determine the weight of the evidence and credibility of the witnesses on controverted questions of fact. (*Murray v. Kleen Leen, Inc.* (1976), 41 Ill. App. 3d 436, 441.) The existence of a conspiracy is a question for the trier of fact. (*Blivas & Page, Inc. v. Klein* (1972), 5 Ill. App. 3d 280.) A court of review will not set aside a jury verdict on the ground that it is contrary to the manifest weight of the evidence where there is sufficient credible evidence in the record to support the jury's verdict. (See *Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 305.) Here, we conclude that there was sufficient credible evidence to support the jury's verdict.

OMC then argues that the damages were in excess of that proved. J.F.'s accountant testified that J.F. lost $13,892 in start-up costs due to the cancellation of the contract and $31,250 in lost profits for 1981 as well as in excess of $130,000 over the next four years. OMC argues that since specific losses for one year total $45,142 and the jury awarded $64,000 in compensatory damages, the award exceeds plaintiff's proved damages by $18,858 and the reviewing court should reduce the judgment by that amount. It bases this argument on the theory that damages for breach of contract should place the injured party in the position that he would have been had the contract been performed. (*Alover Distributors, Inc. v. Kroger Co.* (7th Cir. 1975), 513 F.2d 1137.) Since this court has the power to enter a remittitur under Supreme Court Rule 366(a)(5) (87 Ill. 2d R. 366(a)(5); *Quad County Distributing Co. v. Burroughs Corp.* (1979), 68 Ill. App. 3d 163, 166), OMC urges it should do so in the amount of $18,858.

The purpose of awarding compensatory damages is to make the injured party whole and not to give him a profit. (*Bimba Manufacturing Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 271.) Many injuries are incapable of exact mathematical certainty, and the amount of the verdict is largely within the discretion of the jury. (*Lau*

*v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 452.) A reviewing court will "test the excessiveness of the jury verdict by questioning 'Whether or not the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience.' " *Carraher v. Bacon* (1976), 43 Ill. App. 3d 16, 21, quoting *LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d. 1001, 1030.

Here, the plaintiff provided the jury with the testimony of its accountant who was examined and cross-examined. His testimony was based on generally accepted accounting procedures. The defendant introduced no contrary evidence, choosing only to cross-examine plaintiff's witness. It has been stated that where lost profits are based on various time frames, a line must be drawn at some point and it is the fact finder's role to draw it. (See *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 836.) The future profits revolve around the renewability of the dealership contract. Fiorenza testified that the contract was for a one-year minimum term and was annually renewable. OMC's regional sales manager testified that "[i]t's always hoped that a dealer will run with you for a reasonable period of time." All parties admit that FMH was an OMC dealer for approximately 3½ years in spite of disappointing sales. Eighmy testified it was common industrial practice for construction-equipment contracts to run for one year and be automatically renewable. That OMC has continued EEC as its dealer since 1980 lends credence to the reasonableness of a five-year lost-profits calculation. While the award of $64,000 is somewhat greater than the start-losses and first-year lost profits, it is considerably lower than the anticipated five-year losses and is not manifestly erroneous. The finding of a $64,000 judgment for damages is not so excessive as to shock the judicial conscience, and we find that a remittur is not required on these facts.

OMC then argues that there is no basis for the award of punitive damages. OMC's argument presumes that either (1) there was no independent tort of conspiracy or (2) there was no evidence of any aggravating circumstances which would lead to the imposition of punitive damages. OMC argues that punitive damages may not be awarded for breach of contract. (*E.g., St. Ann's Home for the Aged v. Daniels* (1981), 95 Ill. App. 3d 576, 580.) The exception to this rule is where the breach amounts to an independent tort and there is proof of aggravating circumstances such as malice, wantonness or oppression. 95 Ill. App. 3d 576, 580.

J.F. contends that the trial court made express findings that the

case was appropriate for punitive damages and that *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, supports imposition of punitive damages for the intentional tort of conspiracy, which decision rests solely in the discretion of the trial court. *Obermaier v. Obermaier* (1984), 128 Ill. App. 3d 602, 610, states: "Whether to award punitive damages is an issue for the sound discretion of the trial court, and its decision will not be set aside absent an abuse of discretion." J.F. argues that punitive damages are appropriate where there is evidence of malice, wantonness, or oppression. (*Morrow v. L.A. Goldschmidt Associates, Inc.* (1985), 112 Ill. 2d 87, 95, citing *Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill. App. 3d 822, 829; *Hannigan v. Sears, Roebuck & Co.* (7th Cir. 1969), 410 F.2d 285.) In the instant case, J.F. contends the conduct of OMC and EEC clearly supports a finding of willfulness and conscious disregard of J.F.'s contractual rights and business commitments.

■ Punitive damages may be awarded in certain contract cases which have some independent basis in tort, and that measure of damages is for the jury to determine. But it is a question of law whether the facts of the particular case bring it within the rule in which punitive damages may be assessed. (*Eshelman v. Rawalt* (1921), 298 Ill. 192; *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 87.) The general rule is that punitive damages are not recoverable in actions for breach of contract. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 187.) The general rule does not apply, however, where the breach amounts to an independent tort and there are proper allegations of malice, wantonness or oppression. (*Morrow v. L.A. Goldschmidt Associates, Inc.* (1985), 112 Ill. 2d 87, 95.) Further, if defendant's misconduct is not above and beyond the conduct needed for the basis of the action, punitive damages should not lie. (*O'Brien v. State Street Bank & Trust Co.* (1980), 82 Ill. App. 3d 83.) Even a finding of conspiracy to breach a contract will not, in itself, justify the imposition of punitive damages.

In *Blivas & Page, Inc. v. Klein* (1972), 5 Ill. App. 3d 280, the plaintiff architects sued the defendant housing developers for conspiracy to induce a breach of contract. Defendants had orally agreed to engage plaintiffs to provide architectural services on various FHA projects. A third-party defendant, however, conspired with defendant to oust plaintiffs from the project. Plaintiffs were terminated for fabricated reasons and sued defendants. The jury found for the plaintiffs and awarded compensatory and punitive damages. On appeal, however, the court reversed the award of punitive damages. (5 Ill. App. 3d. 280, 288.) The court recognized that punitive damages had been awarded in some Illinois cases dealing with civil conspiracy, but emphasized that

"punitive damages for an unlawful conspiracy must be based upon an element of malice, violence, wilful or wanton conduct, oppression or wanton recklessness, or circumstance of aggravation." (5 Ill. App. 3d 280, 287.) An examination of the record found facts supporting the breach and a conspiracy. The court concluded that "the conduct alleged and proven herein while sufficient for the awarding of actual damages to the plaintiffs is not characterized by the type of wantonness *** or circumstances of aggravation necessary for the awarding of punitive damages." 5 Ill. App. 3d 280, 288.

Here, a contract was breached as the result of an inducement by a third party, but there are no facts which would support the required element of malice, wantonness or oppression. In fact, OMC admits, and Fiorenza testified, that OMC made every effort for a smooth transition in dealerships. OMC repurchased all of J.F.'s equipment (including obsolete equipment which J.F. had acquired from another dealer). The evidence showed OMC's intentions were plainly to seek another dealer who would provide stronger representation in the Rockford area. OMC put J.F. in touch with EEC with the hopes that EEC could relieve J.F. of any remaining stock and with the hopes that Fiorenza could work for EEC.

■■■ As is stated in *Album Graphics, Inc. v. Beatrice Foods Co.* (1980), 87 Ill. App. 3d 338, 350: "The law does not condone breach of contract, but it does not consider it tortious or wrongful. If a party desires to breach a contract, he may do so purposely as long as he is willing to put the other party in the position he would have been had the contract been fully performed. [Citation.] Fault is irrelevant to breach of contract. Whether one intentionally, carelessly, or innocently breaches a contract, he is still considered to be in breach of that contract and the extent of his liability is generally the same." As was recently stated by the Illinois Supreme Court in *Morrow v. L. A. Goldschmidt Associates, Inc.* (1985), 112 Ill. 2d 87, 96: "The line of demarcation between tort and contract is sometimes difficult to make, and occasionally, the conduct complained of can constitute both a breach of contract and a tort. [Citations.] Nevertheless, *** recovery for solely economic losses is more appropriately governed by contract, rather than tort, law principles." While there is evidence of conspiracy in the instant case, we find no malice sufficient to support an award of punitive damages. (See *Blivas & Page, Inc. v. Klein* (1972), 5 Ill. App. 3d 280.) The aggravating circumstances necessary to support an award of punitive damages must rise above the conduct needed to establish the breach. *O'Brien v. State Street Bank & Trust Co.* (1980), 82 Ill. App. 3d 83, 86.

OMC finally argues that if this court affirms all or a portion of the compensatory award, but reverses the punitive award, the amount paid in settlement by EEC should be a set off against compensatory damages. OMC cites *Dick v. Gursoy* (1984), 124 Ill. App. 3d 185, which holds that in the absence of an agreement to the contrary, a settlement amount must be set off against the total judgment. This policy prevents plaintiff from receiving a double recovery.

The motion for a setoff was part of a supplemental post-trial motion filed 31 days after the verdict was rendered, but this is not fatal. The question of a setoff does not arise as a result of a trial, and the issue may be raised at any time.

J.F. argues that the stipulation signed did not specify that the settlement would be set off against any actual damages awarded against OMC; therefore, the reviewing court should not disturb the trial court's discretionary application of the setoff solely to the punitive damages. See *McDaniel v. Hoge* (1983), 120 Ill. App. 3d 913.

*Dick v. Gursoy* (1984), 124 Ill. App. 3d 185, is a medical malpractice case wherein decedent's husband sued five physicians and a hospital, alleging negligent misdiagnosis and mistreatment of cancer. At trial, the hospital and four physicians settled, leaving Gursoy sole defendant. The jury found for the plaintiff and awarded $100,000 for wrongful death and $200,000 for the survival action. After judgment was entered on the verdicts, defendant moved for a setoff of $260,000, the amount of the settlement of the physicians and hospital. The trial court approved the settlement as being an exchange for plaintiff's covenants not to sue regarding only the wrongful death count. A setoff was granted, therefore, only with regard to the $100,000 wrongful death verdict. Our court held that the defendant was entitled to a setoff of $260,000 from both jury verdicts. The court noted that Illinois has a policy against double recovery by tort plaintiffs. (124 Ill. App. 3d 185, 189a, citing *Popovich v. Ram Pipe & Supply Co.* (1980), 82 Ill. 2d 203, 208.) Therefore, pursuant to the authority given under Supreme Court Rule 366(a) (87 Ill. 2d R. 366(a)), it granted defendant's motion. Such a determination is appropriate in this case.

The judgment of the court in awarding punitive damages is reversed; all other matters are affirmed and modified by the application of a setoff in the amount of $7,500.

Affirmed in part and reversed in part and modified in part.

UNVERZAGT and HOPF, JJ., concur.