ANDREW J. ROBERTS III, Plaintiff-Appellee, v. NORFOLK AND WEST-
ERN RAILWAY COMPANY, Defendant-Appellant.

Fourth District   No. 4—91—0647

Opinion filed June 4, 1992.

COOK, J., specially concurring.

Karl D. Dexheimer, of Belleville, for appellant.

Glenn E. Bradford and Clarence W. Harrison II, both of Morris B. Chapman & Associates, Ltd., of Granite City, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:
Plaintiff Andrew J. Roberts brought suit against his employer, Norfolk and Western Railway Company (N&W), pursuant to the Fed-

eral Employers' Liability Act (45 U.S.C. §§51 through 60 (1988)) (FELA) for personal injuries sustained during the course of his employment. A jury awarded Roberts approximately $1.4 million in damages. N&W appeals, raising the following six issues: (1) whether the trial court erred in permitting Roberts to present evidence of statements made by another employee of N&W and treat those statements as admissions of N&W; (2) whether the trial court erred in denying discovery of medical records regarding Roberts' psychiatric condition and chemical dependencies; (3) whether the trial court erred when barring the testimony of Dr. Murray Finn and portions of the testimony of Dr. Richard Ashby and Dr. Pedro Ochoa; (4) whether the trial court erred in denying N&W leave to have Roberts examined by a registered occupational therapist; (5) whether the trial court erred in submitting the court's instruction No. 1, regarding mitigation of damages, instead of N&W's tendered instruction regarding mitigation of damages; and (6) whether the amount of the jury verdict was grossly excessive. We reverse and remand for a new trial based on one of the issues raised, but address the issues likely to recur on retrial.

## I. FACTS

Roberts began working for N&W in 1974 as a switchman. The duties of the switchman include throwing the switch (a device which allows cars to go onto different tracks), making up and taking apart trains, and classifying cars for different trains. Roberts was working on April 8, 1984, as a switchman on the "12 [p.m.] No. 1 crew." On that same night in that same area of the yards, another crew, known as the "11:15 No. 1 crew," was also working. Roberts' train consisted of only an engine while the 11:15 No. 1 train had approximately 14 cars.

The 11:15 No. 1 train was in a position east of the master switch waiting on the classification track to move onto another track. Roberts' train was also on the classification track, only to the west of the 11:15 No. 1 train. Roberts train was in the process of leaving the classification track and maneuvering onto the back tracks. To do this, Roberts' train had to pass through the master switch and in front of the 11:15 No. 1 train. Before passing through the master switch, Roberts jumped off his engine and threw the switch in order to align it so that his train went onto the back tracks.

Roberts testified that after his train went through the master switch, he threw the switch to align it for the other crew. Roberts saw the switchman for the 11:15 No. 1 train near the master switch and told him that he had already thrown the switch for that train.

Roberts then gave his engineer a signal to back up the train. Roberts testified that after he threw the switch he turned around and walked toward his engine to start to get on it. Roberts stated he had one foot on the engine when all of sudden he turned around and realized the 11:15 No. 1 train was going to run into his train. He then fell off of his engine and heard a pop in his back. Roberts noticed a car on the 11:15 No. 1 train was starting to shake and roll, and he tried to get out of the way because he thought it was going to derail on top of him. Roberts began to run away from the train, and fell down and hit his back on one of the railroad tracks.

Roberts testified the signal he gave to his crew engineer was done through a series of arm movements with a switch lantern and the signal he gave to his engineer that night was a "backup" signal. Roberts indicated he realigned the switch for the 11:15 No. 1 crew as a courtesy and that this was not unusual in this type of industry. Roberts admitted he was familiar with the rules and regulations of the railroad, and knew he was not authorized to give a signal to another crew member nor was another crew member authorized to take a signal from him.

Roberts attempted to return to work after reporting the accident but after four or five hours had to be taken to the hospital. At the hospital, X rays were taken of his back, and he was diagnosed as having a sprained back. Roberts continued to have back pain and finally in September 1984, upon referral from his attorney, Roberts went to see Dr. Pedro Ochoa. Dr. Ochoa admitted Roberts to the hospital and recommended a back specialist, Dr. Richard Ashby. Roberts had his first surgery on his back on September 25, 1984, after which he was hospitalized for a period of one month. Roberts indicated he improved for approximately four months after the surgery but began having severe pain again. He was admitted to the hospital in August 1985 again for muscle tension and back spasms. In 1986, Roberts was given a spinal nerve block for pain. Approximately six months later, he had his second back surgery and was hospitalized for approximately four weeks thereafter. Roberts continued to have physical therapy after the second surgery, and for approximately three months, the pain started to go away.

In 1988, Roberts was again hospitalized for back pain, at which time he received more physical therapy. In September 1989, Roberts was still experiencing back pain and went to see Dr. Ashby, who recommended surgery. On his third surgery, Roberts' lower back was reconstructed. Roberts testified he still is in a lot of pain but it has improved since the last surgery.

Roberts has not worked since the date of his injury. In 1987, he attempted to get his general equivalency diploma but that attempt was unsuccessful. After his third surgery, Roberts obtained a partial release from his doctors indicating he could return to work on a trial basis. However, N&W refused to allow him to work on a trial basis.

Roberts presented testimony of six other witnesses. Dr. Ochoa described the three surgical procedures performed on Roberts and the various diagnosis and treatments he had given Roberts. Mary Jo Hilliard testified she was an occupational therapist and in that capacity performed evaluations on injured employees to determine their functional capability in terms of returning to their jobs. Hilliard performed such an evaluation on Roberts on November 29 and December 3, 1990. She described the tests performed on Roberts and the results thereof.

James England, a rehabilitation counselor, testified he had received a referral from Roberts' attorney to perform an evaluation of Roberts. In September 1989, England performed a series of tests on Roberts and evaluated his employability and educational skills. England concluded that vocational rehabilitation was not appropriate for Roberts because of the combination of problems he was experiencing, including his pain and intellectual background. Gilbert Rutland, a professor of economics, explained to the jury the damages incurred by Roberts in terms of past lost wages and future lost wages. He described how he calculated the various figures for Roberts' lost wages and reduced them to present cash value.

Finally, Roberts presented testimony of two N&W employees. One, Paul E. Gibson, a division superintendent of N&W, testified he had received a letter from the chief medical doctor of N&W, who indicated that Roberts could not return to work for a trial period of time. This letter also indicated that doctor did not believe Roberts could ever return to work as a switchman. L.P. Reed was the hearing officer who presided over the investigative hearing conducted after the accident in April 1984. His testimony will be discussed in further detail below.

The first witness for N&W, Robert Branham, was the engineer on Roberts' train in April 1984. Branham explained that after Roberts threw the switch, and attempted to get back on the engine, he had to slow the train down in order to allow Roberts to jump on the train. Branham testified Roberts gave a fast "backup" signal with his switch lantern, which indicated to him to move in a reverse direction. Branham further testified that when he turned around to see if

Roberts had gotten on the engine yet, he could see the other train coming down the track and he knew that they were going to collide.

Thomas Daniels, the switchman for the 11:15 No. 1 crew, testified he was aware that the 12:00 No. 1 crew was working in the same area that evening and that it was his job to throw the switch to make sure that his train went down the proper track. Daniels spoke with Roberts in the area of the master switch and Roberts had told him he (Roberts) would throw the switch for their crew. Daniels said he would get the switch himself because it was his job. Daniels testified Roberts gave an exaggerated "backup" signal, which could be interpreted as a "kick" signal. It was this signal, according to Daniels, that resulted in the engineer for the 11:15 No. 1 train moving his train. After seeing his cars start to move, Daniels gave his engineer a "stop" signal.

Bruce Cobbs, an assistant train master for N&W, testified he spoke with Roberts shortly after the incident in April 1984 and the signal demonstrated that evening by Roberts was a large, exaggerated signal. He explained the signal demonstrated by Roberts was a "kick" signal, which is an indication for the engineer of the train to increase the speed of the engine so he can kick the cars down the track.

Douglas Cole testified he was an occupational therapist in St. Louis, Missouri, and had been provided Roberts' records by N&W's attorney. Based on those records, he believed Roberts would be physically capable of performing at least light-level employment and possibly more than that. Finally, N&W presented testimony of Dr. Ashby, which will be discussed below.

On March 1, 1991, the jury returned a verdict in favor of Roberts in the amount of $1,410,296. Defendant's post-trial motion was denied on August 6, 1991. N&W filed this appeal on September 3, 1991.

## II. ROBERTS' TESTIMONY ON
### WAINSCOTT'S STATEMENTS

The first issue raised by N&W is that the trial court erred in allowing L.P. Reed, the hearing officer who presided over N&W's internal investigation of the incident, to testify to statements made by Doug Wainscott, the engineer of the 11:15 No. 1 train.

Over objection by N&W, Roberts elicited testimony from Reed regarding two statements made by Wainscott at this hearing. The first statement was an admission of Wainscott that he was not aware that Roberts' train was in the same area as his train. The second statement of Wainscott testified to by Reed was that Wainscott admitted it

was "virtually impossible" to determine who gave the signal by the switch lantern. Reed had difficulty in remembering this statement of Wainscott but his memory was refreshed after looking at the written transcript of the hearing.

At trial, N&W contended these statements were not admissible under the business records exception to the hearsay rule and also were inadmissible as admissions of the railroad. Roberts specifically stated these statements were not being offered as business records but were admissible as admissions against interest because N&W had asserted in its opening statement the 11:15 No. 1 crew knew the 12:00 No. 1 crew was in the same area. Roberts also relied on two cases, *Poltrock v. Chicago & North Western Transportation Co.* (1986), 151 Ill. App. 3d 250, 502 N.E.2d 1200, and *Amos v. Norfolk & Western Ry. Co.* (1989), 191 Ill. App. 3d 637, 548 N.E.2d 96, for support of its admission-against-interest argument.

However, the statements admitted in *Amos* and *Poltrock*, which were contained in written reports admitted into evidence, were so admitted under the business records exception to the rule against hearsay. The *Amos* court stated:

> "Where the report is damaging to the party who prepared it, as here, there is no reason to question its trustworthiness. As in *Poltrock*, the summaries of defendant's employees' statements were properly admitted under the business records exception to the hearsay rule." (*Amos*, 191 Ill. App. 3d at 646, 548 N.E.2d at 101.)

(See also *Poltrock*, 151 Ill. App. 3d at 254-55, 502 N.E.2d at 1203.) Here, Roberts specifically stated he was not seeking to have these statements admitted under the business records exception and the transcripts of the hearing were not admitted. Thus, these cases offer no support for the admission of these two statements.

Hearsay evidence is testimony in court or written evidence of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter. (*People v. Silagy* (1984), 101 Ill. 2d 147, 171, 461 N.E.2d 415, 427.) As a general rule, the substantive use of such a statement at trial is inadmissible unless it comes within a recognized exception to the hearsay rule. (*Taylor v. Checker Cab Co.* (1975), 34 Ill. App. 3d 413, 419, 339 N.E.2d 769, 775.) In order to introduce a statement or act by an agent or employee as an admission it must first be shown (1) that he was such an agent or employee; (2) that such statement or act was made or done in and about a matter over which he had actual or ap-

parent authority, and (3) that he spoke or acted under or by virtue of his authority as such agent or employee. *Kapelski v. Alton & Southern R.R.* (1976), 36 Ill. App. 3d 37, 42, 343 N.E.2d 207, 210; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §802.9, at 609 (5th ed. 1990).

■ It is undisputed that Wainscott was an employee of N&W at the time of the occurrence. Furthermore, testimony at trial established he had authority to make the statements which would constitute admissions of N&W. Branham testified the foreman is in charge of the crew. However, at the time of the accident, the foreman of Wainscott's train was not present. Since Wainscott was the engineer of the train and was authorized to take the signals from the switchman, and was the highest ranking crew member present at the site of the occurrence, it can be concluded that at that particular point in time, he was in charge of the operation of the train. As such, we believe he had authority over the matter of the accident about which the statements were made. At the hearing when the statements were made, Wainscott spoke by virtue of the authority he had at the time of the accident and thus his statements qualify as admissions of N&W. Accordingly, they were properly admitted into evidence as exceptions to the hearsay rule.

■ Similarly, these statements were also admissible as declarations against interest. The common law requirements of the declaration against interest exception to the hearsay rule are (1) that the declarant be unavailable; (2) the declaration has been made against his pecuniary or proprietary interest when made; (3) the declarant has had competent knowledge of the fact declared; and (4) the declarant had no probable motive to falsify. The basis for this exception is that there is an assumption that people do not make false statements damaging to themselves. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §804.7, at 695 (5th ed. 1990).

First, testimony at trial indicated Wainscott was unavailable in that he no longer resided in the State of Illinois and was no longer an employee of N&W. Next, Wainscott's statements were against his pecuniary interest when made because of the nature of the proceedings in which they were made. Direct acknowledgements of facts giving rise to liability are against interest. (*Karlin v. Inland Steel Co.* (1979), 77 Ill. App. 3d 183, 186, 395 N.E.2d 1038, 1040.) Wainscott was admitting he violated the safety rules of his employer by taking a signal not knowing who it was from, and he knew he could be subject to discipline for this action. Wainscott had competent knowledge of the fact declared, inasmuch as he was the engineer of the train that ran into

Roberts' train, and by taking this signal, caused the collision. Finally, Wainscott had no motive to falsify the statements. If Wainscott had lied about these statements, he would have made contrary statements, thereby relieving himself of any wrongdoing, and would instead have accused Roberts of wrongdoing. However, his admission of wrongdoing indicates he had not lied about these statements. Wainscott made damaging statements about himself and there is no reason to question their trustworthiness. Accordingly, admission of this testimony was not error.

### III. Denial Of Discovery Of Plaintiff's Medical Records On Psychiatric Condition And Chemical Dependency

■ Next, N&W contends the trial court erred in denying discovery of Roberts' medical records regarding his psychiatric condition and chemical dependency. Roberts asserts that these records are privileged under the Mental Health and Developmental Disabilities Confidentiality Act (Confidentiality Act) (Ill. Rev. Stat. 1989, ch. 91½, par. 801 et seq.) and the Illinois Alcoholism and Other Drug Dependency Act (Alcoholism Act) (Ill. Rev. Stat. 1989, ch. 111½, par. 6351—1 et seq.). In response, N&W alleges that Roberts has waived his privilege under these acts because he (1) identified Dr. Murray as an expert witness, and (2) allowed Dr. Finn's evidence deposition to be taken, in which Finn discussed Roberts' history, diagnosis and treatment for psychiatric disease and chemical dependency. N&W further suggests Roberts has waived this privilege by placing his mental condition in issue by seeking damages for lost wages. We need not address the merits of either party's argument, however, because we conclude that N&W has waived the issue of the admissibility of these records.

On February 28, 1989, N&W filed a motion to compel the production of these records. The docket entry for April 5, 1989, indicates that the trial court conducted an *in camera* review of these records. The court concluded, "Plaintiff's complaint places at issue his general physical and mental condition arising from the alleged 'numerous and permanent injuries to his body.'" The court further stated Roberts had waived the physician-patient privilege as to the records and, since the records were relevant, ordered Roberts' attorney to make the records available to N&W for inspection and copying within 28 days.

Neither party learned of the court's order and Roberts' attorney failed to forward the records to N&W. Sometime thereafter, at a pretrial conference, the trial court noted it was unaware that Roberts was relying on the privilege pursuant to the Confidentiality Act and

the Alcoholism Act. The court advised Roberts to file a motion to reconsider, which he did on December 18, 1989.

On January 2, 1990, the trial court heard arguments on Roberts' motion to reconsider. Because of the critical importance of this issue to our determination, we quote the docket entry for that date in full:

> "Attorney Glenn E. Bradford present in open court in behalf of plaintiff. Attorney William Niehoff present in open court in behalf of defendant. By agreement cause called for hearing on plaintiff's motion to reconsider which was filed December 18, 1989. Defendant files memorandum in opposition to motion to reconsider this date, attached thereto Exhibit 1, which is deposition of Dr. Finn. Arguments on plaintiff's motion to reconsider heard. Plaintiff's motion granted. Order entered on April 5, 1989 is vacated. *It is the order of the court that the plaintiff is not required to make available to the defendant the plaintiff's records of drug and alcohol or mental health treatment prior to April 9, 1984.* It is further the order of the Court that at trial defendant will be barred from presenting evidence of plaintiff's disability or unemployability except as it relates directly to plaintiff's back injury and back surgery and disability and unemployability directly resulting from the plaintiff's claimed injury and subsequent treatment. *All plaintiff's mental health and drug and disability records are barred form [sic] discovery except by leave of Court.* No written order to be filed. Clerk is directed to mail copy of the minute order to attorneys for plaintiff and defendant by regular mail and file proof of mailing." (Emphasis added.)

Subsequently, on January 17, 1990, N&W filed a stipulation to reform the order of January 2, 1990, since the docket entry of that date contained a typographical error. A proposed amended order was submitted and the court approved that amendment. The amended order stated plaintiff was barred from presenting evidence of his disability or unemployability except as it related to his back injury and surgery. The docket entry for January 17, 1990, indicated this approval and directed the clerk to mail duplicate copies of the order to both parties. The docket entry for January 19, 1990, noted the filing of the clerk's certificate of mailing copies of the amended order to both parties.

As noted in the emphasized portion of the docket entry of January 2, 1990, the trial court barred Roberts' medical records for drug, alcohol, or mental treatment prior to April 9, 1984, the date he was injured. Clearly, any treatment for drug or alcohol abuse or psychiatric problems prior to the injury is not relevant and is privileged under

the Confidentiality Act and the Alcoholism Act. There was no evidence presented at trial to suggest Roberts was under the influence of drugs or alcohol at the time of the occurrence, nor did any mental problems contribute to or cause this accident. N&W suggests that these records are relevant because they directly relate to the extent of Roberts' injury and damages. Yet, no evidence was presented to show Roberts missed work prior to the accident because of these problems. Therefore, we conclude the trial court properly barred all records of treatment prior to the incident.

Furthermore, the other sentence emphasized in the docket entry for January 2, 1990, indicated Roberts' medical records for treatment after the date of the injury were barred from discovery except by leave of court. Thus, with leave of court, N&W may have been permitted to obtain the records for drug, alcohol or mental treatment after the accident. However, so far as we are able to determine from a search of the record on appeal, N&W made no further effort to obtain leave of court to discover these records. N&W failed to file any pleadings to discover these records, although the docket entry implies it could do so.

Issues raised for the first time on appeal may not normally be considered by the appellate court or be argued on appeal. (*Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 303, 443 N.E.2d 575, 577.) Inasmuch as N&W had the opportunity to discover Roberts' medical records for treatment after the accident, but failed to seek leave of court to obtain those records, it cannot now claim the denial of discovery of those records as error. See, *e.g., Manning v. Mock* (1983), 119 Ill. App. 3d 788, 808, 457 N.E.2d 447, 459.

### IV. MOTION *IN LIMINE* RULING

N&W next contends the trial court erred in granting Roberts' motion *in limine* to exclude portions of Dr. Ochoa's and Dr. Ashby's depositions and completely excluding Dr. Finn's deposition.

#### A. *Dr. Ochoa's Deposition*

■ Dr. Ochoa's deposition was presented to the jury by videotape. Prior to showing the tape, the trial court explained to the jury that the tape had been edited to delete matters on which it had granted an objection. While the record on appeal contains a transcript of the videotaped deposition as heard by the jury, it does not contain a copy of the deposition setting forth the deleted testimony upon which its argument is based. An appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim

of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant. (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 459 N.E.2d 958.) N&W complains that the parts of Dr. Ochoa's deposition that were deleted should not have been, but without the benefit of seeing the deleted testimony, there is no basis for holding the trial court abused its discretion in deleting those portions of the deposition.

## B. *Dr. Ashby's Deposition*

Dr. Ashby's deposition was read to the jury by defense counsel. Prior to this, portions of his deposition had been deleted. The attorneys made a record of this process, indicating which lines were to be omitted; however, this was done referring to the page numbers of the original deposition. The record on appeal instead contains the deposition in its entirety paginated in sequence with the rest of the trial transcript; it does not reflect the original pagination. N&W has failed to include on the record on appeal the original deposition of Dr. Ashby. Thus, this court cannot determine which portions were deleted from the deposition. N&W has indicated in its brief which lines were deleted from Dr. Ashby's deposition, but without the original deposition, we cannot determine whether these in fact were the lines deleted from this deposition. Accordingly, there is no basis to hold the trial court abused its discretion in deleting portions of the deposition.

## C. *Dr. Finn's Deposition*

Finally, Dr. Finn's deposition was entirely barred from being admitted into evidence and has been included in the record on appeal. The trial court indicated it had read Dr. Finn's deposition in its entirety before ruling on its admission. N&W contends that this testimony was relevant because it bears upon the causation of Roberts' disability and the extent of his pain and suffering. N&W further asserts that this testimony would be proper for impeachment purposes.

■ Section 10(a)(1) of the Confidentiality Act (Ill. Rev. Stat. 1989, ch. 91½, par. 810(a)(1)) provides that a patient's records may be disclosed in a civil proceeding in which the recipient has introduced his mental condition or any aspect of his services received for such condition as an element of his claim or defense. The records can be disclosed if, after an *in camera* examination of the evidence, a trial court determines that (1) the records are relevant, probative, not unduly prejudicial or inflammatory and otherwise clearly admissible; (2)

other satisfactory evidence is demonstrably unsatisfactory evidence of the facts sought to be established by such evidence; and (3) disclosure is more important to the interests of substantial justice than protection from injury to the therapist-recipient relationship or to the recipient or other who disclosure is likely to harm. Ill. Rev. Stat. 1989, ch. 91½, par. 810(a)(1).

### 1. Waiver by Identifying Finn as an Expert

■ N&W suggests that Roberts has waived this privilege in two ways. First, it alleges Roberts waived the privilege by identifying Dr. Finn as an expert witness pursuant to Supreme Court Rule 220 (134 Ill. 2d R. 220). The purpose of section 10(a)(1) of the Confidentiality Act is to preserve the confidentiality of the records and communications of persons who are receiving or who have received mental health services. The privilege of confidentiality encourages complete candor between patient and therapist and provides motivation for persons who need treatment to seek it. (*Novak v. Rathnam* (1985), 106 Ill. 2d 478, 478 N.E.2d 1334.) We do not believe Roberts waived his privilege merely by identifying Dr. Finn as an expert witness. By accepting N&W's argument that disclosure of an expert and the taking of a deposition waives any privilege under the Confidentiality Act, that privilege would effectively be eliminated. The purpose of the privilege is to encourage candor between a physician and his patient and that candor would be hampered by allowing the privilege to be waived through discovery. Discovery is a vital part of the pretrial phase of a case and would be severely limited by a fear that naming a physician as a potential witness and allowing that deposition to be taken would allow communications regarding mental treatment to be discoverable. Accordingly, we reject this aspect of N&W's waiver argument.

### 2. Waiver by Placing Mental Condition at Issue

■ N&W also suggests Roberts has waived this privilege by introducing his mental condition as an element of his claim or defense. This privilege can also be waived by placing one's mental condition in issue. (*Bland v. Department of Children & Family Services* (1986), 141 Ill. App. 3d 818, 490 N.E.2d 1327.) We conclude that Roberts has placed his mental condition in issue by seeking compensatory damages.

The purpose of compensatory tort damages is to compensate the plaintiff for his injuries, not to punish defendants or bestow a windfall upon plaintiffs. (*Wilson v. Hoffman Group, Inc.* (1989), 131 Ill. 2d

308, 321, 546 N.E.2d 524, 530.) The purpose of awarding compensatory damages is to make the injured party whole and not to give him a profit. *J.F. Equipment, Inc. v. Owatonna Manufacturing Co.* (1986), 143 Ill. App. 3d 208, 217, 494 N.E.2d 516, 522.

Part of Roberts' claim included damages for past and future lost wages. These damages are compensatory in nature because they purport to make him whole since, but for the injury, he could have worked. However, the deposition testimony of Dr. Finn might have established that Roberts' back injury is not the only reason he was unable to return to work. Dr. Finn stated in his deposition that Roberts' inability to return to work could have been caused by his alcoholism or chemical dependency. Moreover, Dr. Finn's testimony might have established that during Roberts' hospitalization for mental health treatment, which was after his injury but prior to his first back surgery, he was physically active and did not complain of back pain. Accordingly, inasmuch as Dr. Finn's testimony related to the amount of damages suffered by Roberts, the trial court abused its discretion in barring his testimony. Because this testimony should have been admitted into evidence, N&W is entitled to a new trial.

## V. Denial Of Rehabilitation Exam

■ N&W asserts that the trial court erred in denying its motion for a rehabilitation examination. N&W suggests the trial court should have ordered Roberts to submit to an examination by an occupational therapist of its choice to determine what physical work capacity and vocational rehabilitation potential existed for him. N&W offers no authority for the trial court to order such an examination other than asserting such authority comes from "the court's inherent power to order discovery."

Supreme Court Rule 215(a) (134 Ill. 2d R. 215(a)) provides, in pertinent part:

> "In any action in which the physical or mental condition of a party or of a person in his custody or legal control is in controversy, the court, upon notice and for good cause shown on motion made within a reasonable time before the trial, may order the party to submit to a physical or mental examination by a physician suggested by the party requesting the examination *** ."

The provisions of Rule 215(a) are not mandatory, but vest broad discretion in the trial court to determine whether a physical examination should be ordered. (*Jackson v. Whittinghill* (1963), 39 Ill. App. 2d 315, 324, 188 N.E.2d 337, 341; *People ex rel. Yarn v. Yarn* (1979), 73

Ill. App. 3d 454, 456, 392 N.E.2d 606, 608.) The purpose of the rule permitting the court to order the party to submit to a physical or mental examination by a physician suggested by the party requesting examination is not to provide an expert witness for the litigant but to permit discovery. *Carlisle v. Harp* (1990), 200 Ill. App. 3d 908, 913-14, 558 N.E.2d 318, 321.

N&W had adequate opportunity to discover Roberts' work capacity. Its own expert, Douglas Cole, a rehabilitation counselor, examined all of Roberts' medical records and was able to form an opinion about Roberts' work capacity. N&W also had the opportunity to cross-examine Roberts' witnesses, Hilliard and England, regarding his work capacity. While we are not inclined to interpret Rule 215 so strictly as to allow examinations by physicians only, we conclude that the trial court did not abuse its discretion in denying N&W leave to have Roberts submit to such an examination by an occupational therapist of its own choice.

## VI. Instruction On Plaintiff's Duty To Mitigate Damages

N&W next contends that the trial court erred when it refused its instruction regarding Roberts' duty to mitigate his damages and instead submitted its own instruction on that issue. The instruction submitted by N&W was used in *Baker v. Baltimore & Ohio R.R. Co.* (6th Cir. 1974), 502 F.2d 638, 644, and is as follows:

"The law requires that any person who sustains a personal injury must mitigate his damages to the extent reasonably possible. Therefore, with respect to any claim of the plaintiff concerning a reduction in earning power, future lost wages or any inability to earn as much in the future as he would have been able to earn but for the injuries sustained on April 9, 1984, the plaintiff was required to mitigate his damage, and such mitigation may include further scholastic training, vocational rehabilitation training or any other preparation reasonably necessary to include the plaintiff's earning ability in light of his injury."

The instruction submitted by the court provided:

"An injured party is under legal obligation to mitigate his damages, that is to minimize economic loss resulting from his injury. Failure of the injured party to make reasonable efforts to minimize his damages does not prevent all recovery for economic loss, but it does preclude recovery for damages or losses which could have been avoided had a reasonable effort to lessen damages been made."

Where no Illinois Pattern Jury Instruction (IPI) accurately states the law, a non-IPI instruction is permissible under Supreme Court Rule 239(a) (134 Ill. 2d R. 239(a)) if it is simple, brief, impartial, and nonargumentative. *Fravel v. Morenz* (1986), 151 Ill. App. 3d 42, 46, 502 N.E.2d 480, 482; *Daly v. Carmean* (1991), 210 Ill. App. 3d 19, 31-32, 568 N.E.2d 955, 963.

■ Although N&W's tendered instruction was adopted by the Sixth Circuit in *Baker*, neither the United States Supreme Court nor any Illinois court has adopted that particular instruction. Accordingly, this court is not bound to accept that instruction.

In *Brown v. Chicago & North Western Transportation Co.* (1987), 162 Ill. App. 3d 926, 516 N.E.2d 320, the First District Appellate Court recently addressed this particular issue and instruction. The instruction tendered by defendant there was almost identical to the one given in the present case, the only difference being the instruction in *Brown* included the phrase, " 'by resuming gainful employment as soon as such can reasonably be done' " at the end of the first sentence of the instruction. (*Brown*, 162 Ill. App. 3d at 931, 516 N.E.2d at 324.) The instructions were otherwise identical. See also *Amos*, 191 Ill. App. 3d at 639-40, 548 N.E.2d at 97-98 (wherein this instruction was also tendered).

The court in *Brown* concluded the instruction offered by defendant correctly stated the law. Under FELA, employees have a duty to mitigate their damages by returning to gainful employment as soon as reasonably possible. (*Brown*, 162 Ill. App. 3d at 931-32, 516 N.E.2d at 324-25; *Amos*, 191 Ill. App. 3d at 641, 548 N.E.2d at 99.) The instruction tendered by the court in this case met the requirements of Supreme Court Rule 239(a). It was simple, brief, nonargumentative and correctly stated the law as noted in *Brown*.

Although it differs slightly from the one tendered in *Brown*, the difference is of no consequence on the facts before us. The phrase deleted by the trial court here merely explained how the employee was to mitigate his damages, *i.e.*, by going back to work as soon as was reasonable. Much of the evidence adduced at trial raised the issue of whether Roberts was capable of going back to work. N&W's counsel stated in closing argument that Roberts' duty to mitigate his damages included his obligation to go back to work. Therefore, since the instruction met the requirements of Rule 239(a), and the specific process of how Roberts was to mitigate his damages was argued by N&W, the instruction given by the trial court was proper.

## VII. Conclusion

In summary, the trial court properly admitted the statements of Wainscott as admissions of N&W, properly refused to order Roberts to undergo an examination by an occupational therapist of N&W's choice and correctly instructed the jury regarding mitigation of damages. However, the trial court abused its discretion in barring the testimony of Dr. Finn, and for this reason, the judgment is reversed and this cause is remanded for a new trial. Since we have determined that N&W is entitled to a new trial, we need not address its last issue, *i.e.*, the jury verdict was grossly disproportionate to any injury suffered by Roberts.

Reversed and remanded.

LUND, J., concurs.

JUSTICE COOK, specially concurring:

While I agree with the majority as to reversal and remand for a new trial, and with the majority's analysis of most issues, I disagree on some points.

A recipient of mental health or developmental disabilities services who wishes to prevent disclosure of his records or communications must be consistent in expressing his desire for confidentiality. If there is a disclosure of confidential information by the recipient, or if he permits such a disclosure, the privilege is waived and cannot be reasserted. (*Novak v. Rathnam* (1985), 106 Ill. 2d 478, 484, 478 N.E.2d 1334, 1337 (psychiatrist called by defendant in criminal trial required to testify in subsequent civil case; *cf.* self-incrimination privilege).) As to issue IV(C)(1), I would find it inconsistent with the exercise of the privilege for plaintiff to have designated Dr. Finn as an expert witness in accordance with Rule 220(a)(1). (134 Ill. 2d R. 220(a)(1).) Plaintiff chose to make that designation so that he could call Dr. Finn as a witness at trial—so that plaintiff would avoid disqualification of the witness under Rule 220(b)(1). (134 Ill. 2d R. 220(b)(1).) Designation as an expert exposed Dr. Finn to discovery on his conclusions and opinions and the bases therefor. Plaintiff argues he was forced to designate Dr. Finn as an expert because a local court rule required that treating physicians be designated as experts. (*Cf. Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525.) It is still clear the reason Dr. Finn was designated was because plaintiff wanted to be free to call him at trial. Plaintiff could have protected

Dr. Finn from discovery by designating him a "consulting expert," but then plaintiff could not have called Dr. Finn as a witness. (134 Ill. 2d Rules 220(a)(2), (b)(2).) Clearly when plaintiff went on to permit Dr. Finn to be deposed, and did not assert the privilege during the deposition, plaintiff waived the privilege. All matters that are privileged against disclosure at trial are privileged against disclosure through any discovery procedure. 134 Ill. 2d R. 201(b)(2).

Section 10(a)(1) of the Confidentiality Act requires the trial court to balance plaintiff's need for confidentiality against defendant's need for disclosure. Balancing is difficult where different parties suffer the harm and enjoy the benefit. There is a difference between a plaintiff-witness and an ordinary witness. Plaintiff wanted to keep out the testimony of Dr. Finn because it harmed his case, not because plaintiff wanted to preserve the integrity of the therapist-patient relationship. If Dr. Finn's deposition had been more favorable, plaintiff would have called Dr. Finn himself. A plaintiff should not be allowed to use a privilege as both a sword and a shield. *In re Marriage of Hartian* (1988), 172 Ill. App. 3d 440, 452-53, 526 N.E.2d 1004, 1113 (privilege against self-incrimination).

When the trial court heard argument, examined plaintiff's psychiatric and chemical dependency records *in camera*, and issued an order requiring disclosure of those records, then issued a second order barring them from discovery "except by leave of court," the trial court definitively ruled the records were not discoverable. The quoted language in the court's order did no more than remind all concerned that the order was interlocutory and could be changed as circumstances warranted. The language was neither an invitation to nor a requirement that defendant proceed further. I would find that defendant has not waived the issue that denial of discovery of these records was error.

Counsel for defendant was allowed to examine the records which were not disclosed when they were included in the record on appeal in this court. A better procedure would have been to have impounded that portion of the record as was done in *People v. Bean* (1990), 137 Ill. 2d 65, 102-03, 560 N.E.2d 258, 275, *cert. denied* (1991), 499 U.S. 932, 113 L. Ed. 2d 270, 111 S. Ct. 1338. The fact these records have now been disclosed is one more reason why no privilege exists, for example, on retrial. " 'To enforce it thereafter is to seek to preserve a privacy which exists in legal fiction only.' " *Novak*, 106 Ill. 2d at 484, 478 N.E.2d at 1337, quoting 8 Wigmore, Evidence §2389(4), at 860-61 (McNaughton rev. ed. 1961).

In criminal cases the public policy in maintaining the confidentiality of mental health records is subordinate to a defendant's constitutional right to effectively cross-examine an adverse witness to show bias. *Bean*, 137 Ill. 2d at 99-100, 560 N.E.2d at 273-74 (an *in camera* procedure is appropriate to determine which records should be disclosed); *cf. People v. Knuckles* (1992), 226 Ill. App. 3d 714, 718 (defendant's communications protected by attorney-client privilege); *In re Marriage of Lombaer* (1990), 200 Ill. App. 3d 712, 721, 558 N.E.2d 388, 393 (under Illinois Marriage and Dissolution of Marriage Act mental condition considered introduced only if recipient or his witness first testifies concerning the record or communication).

Habitual drug use is a significant factor in evaluating witness credibility. (*People v. Di Maso* (1981), 100 Ill. App. 3d 338, 342-43, 426 N.E.2d 972, 975; *People v. Givens* (1985), 135 Ill. App. 3d 810, 825, 482 N.E.2d 211, 222.) Records regarding a plaintiff's treatment for alcoholism have similarly been held not protected by the Confidentiality Act. (*Maxwell v. Hobart Corp.* (1991), 216 Ill. App. 3d 108, 115, 576 N.E.2d 268, 273.) Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice (*People v. Chambers* (1989), 179 Ill. App. 3d 565, 578, 534 N.E.2d 554, 561), but I would not hold the Confidentiality Act to be an absolute bar to the disclosure of evidence relevant on credibility, especially in a case such as this where plaintiff's credibility is crucial.

As to issue V, I agree with the majority that Supreme Court Rule 215(a), which allows the court to order a party to submit to a mental or physical examination by the opponent's physician, should not be interpreted so strictly as to allow examination only by physicians. I disagree, however, that the trial court properly exercised its discretion in refusing an examination by defendant's occupational therapist or rehabilitation counselor. The rule provides that "[t]he court may refuse to order examination by the physician suggested but in that event shall permit the party seeking the examination to suggest others." 134 Ill. 2d R. 215(a).

> "Absent some substantial countervailing consideration, the defendant should be entitled to a physical examination by a physician chosen by him or the court, even though plaintiff 'informs' defendant by exhibiting to him a report of plaintiff's physicians, hospital records or similar data on which plaintiff may intend to rely at the trial. A party should ordinarily not be relegated to reports obtained by his adversary for his discovery of the nature and extent of his adversary's injuries." (Ill. Ann.

Stat., ch. 110A, par. 215, Historical and Practice Notes, at 355 (Smith-Hurd 1985).)

There is no suggestion in the record that the examination would have been painful, embarrassing, or uncomfortable for plaintiff, and if that suggestion had been made the court could have imposed conditions on the examination. *Carlisle v. Harp* (1990), 200 Ill. App. 3d 908, 558 N.E.2d 318, cited by the majority, denied the request as untimely, a consideration not present in this case. *Jackson v. Whittinghill* (1963), 39 Ill. App. 2d 315, 324, 188 N.E.2d 337, 341, cited by *Carlisle* for the proposition that the purpose of a Rule 215 examination is not to provide an expert witness for the litigant but to permit discovery, involved a request that a second defense expert examine the plaintiff after one examination had been conducted by a general practitioner. When plaintiff here chose to be examined by his own occupational therapist with the intent to present that testimony at trial, the court should have exercised its discretion under Rule 215 to order plaintiff to submit to examination by an occupational therapist chosen by defendant.